**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION AT COVINGTON**

| | | |
|---|---|---|
| **S.R., a minor, by and through his next** | ) | |
| **friend and mother, T.R.,** | ) | Case No.:  2:15-CV-143 |
| | ) | |
| **and** | ) | |
| | ) | ELECTRONICALLY FILED |
| **L.G., a minor, by and through her next** | ) | |
| **Friend and mother, L.J.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **KENTON COUNTY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## STATEMENT OF INTEREST OF THE UNITED STATES

The approximately 19,000 school resource officers ("SROs") in schools across the United States have a powerful role.  SROs can partner with schools to help maintain a safe and positive school environment — when their role is clearly defined and they are trained to perform it properly.  However, children — particularly children with disabilities — risk experiencing lasting and severe consequences if SROs unnecessarily criminalize school-related misbehavior by taking a disproportionate law enforcement response to minor disciplinary infractions.

Plaintiffs' allegations in this case illustrate this risk.[1]  Here, Defendant Kevin Sumner ("Defendant Sumner"), an SRO in the Covington Independent Public Schools District,

---

[1]      For the purposes of this Statement of Interest, filed in the context of Defendants' Motion to Dismiss, the United States accepts the facts presented in the Plaintiffs' complaint as true and views them in their most

handcuffed S.R., an eight-year-old third grader, and L.G., a nine-year-old fourth grader, behind their backs, above their elbows, at the biceps. Both children have disabilities and were handcuffed after exhibiting conduct arising out of these disabilities. The children, through their parents, have filed this lawsuit, alleging that the Defendants' conduct caused them harm and violated their rights under the Fourth and Fourteenth Amendments to the United States Constitution and Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134 ("ADA"). The United States files this Statement of Interest to assist the Court in evaluating the legal standards it should use in considering the Plaintiffs' claims.

Specifically, the United States seeks to affirm the factors the Court must consider in evaluating the objective reasonableness of Defendant Sumner's seizures of both children. Further, the United States seeks to confirm that statutory and regulatory authority well establishes that the ADA applies to police interactions, and to correct misstatements about the ADA in Defendants' brief. Because the ADA is applicable, the Court should evaluate whether, through Defendant Sumner's actions, the Defendant Kenton County Sheriff's Office ("Sheriff's Office") violated the ADA's requirement that government entities reasonably modify procedures, practices, and policies unless doing so would result in a fundamental alteration. The Defendant Sheriff's Office also had a duty to create policies and administer those policies in a way that does not have the effect of discriminating against children with disabilities; the Court should reject Defendants' attempt to avoid that duty.

---

favorable light. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (U.S. 2009). The United States does not take a position on the merits of the case.

2

## INTEREST OF THE UNITED STATES

The United States has authority to file this Statement of Interest pursuant to 28 U.S.C

§ 517, which permits the Attorney General to attend to the interests of the United States in any

case pending in a federal court.[2]

This litigation implicates the rights of children in schools to be free from

unconstitutional police seizures, the rights of children with disabilities to be free from

disability-based discrimination, and the rights of children to be free from civil rights violations

that lead to the cycle of harsh school discipline and law enforcement involvement known as the

"school-to-prison pipeline."  The United States is in a unique position to aid the Court in

addressing these issues because of the authority granted to the Attorney General under the

Violent Crime Control and Law Enforcement Act of 1994 ("Section 14141") and the

Americans with Disabilities Act.  *See* 42 U.S.C. §§ 12133, 12134, 14141.  As explained more

fully below, the facts alleged in the instant case implicate the United States' interests under

both of these laws.

Pursuant to Section 14141, the United States enforces the rights of individuals to be

free from police practices that violate the Constitution or federal statutory law.  The United

States has used its authority under Section 14141 to investigate numerous jurisdictions for

unlawful police practices, including practices that have a particularly harmful effect on

individuals with disabilities.[3]

---

[2]      The full text of 28 U.S.C. § 517 provides: "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

[3]      *See, e.g.*, Letter from Jocelyn Samuels, Acting Ass't Att'y Gen. of the United States, to Hon. Richard J. Berry, Mayor of Albuquerque, N.M. 3 (Apr. 10, 2014), *available at* http://www.justice.gov/crt/about/spl/documents/apd_findings_4-10-14.pdf (finding that the Albuquerque Police

3

Further to this enforcement authority, the United States has a strong interest in eliminating the school-to-prison pipeline, which has a disproportionate effect on students with disabilities and students of color.[4]  The school-to-prison pipeline refers to the use of harsh and exclusionary discipline practices that "push students out of school and into the justice system."[5]  In working to dismantle the pipeline, the United States has addressed discrimination in education, law enforcement, and juvenile justice.  For example, the United States has reached landmark settlements to reform school-to-prison pipeline practices, including exclusionary discipline, school-based arrests, and youth probation practices in the City of Meridian, Mississippi, and Lauderdale County, Mississippi.[6]  The United States has also

---

Department used excessive force against individuals with mental illness); Investigation of the New Orleans Police Dep't, U.S. Dep't of Justice Civil Rights Division, at xiii (Mar. 16, 2011), *available at* http://www.justice.gov/crt/about/spl/nopd_report.pdf (concluding that the New Orleans Police Department failed to implement measures to prevent unreasonable force, including  implementing policies for responding to individuals in mental health crisis); Letter from Thomas Perez, Ass't Att'y Gen. of the United States, to Hon. Sam Adams, Mayor of Portland, Or. 10 (Sept. 12, 2012), *available at* http://www.justice.gov/sites/default/files/crt/legacy/2012/09/17/ppb_findings_9-12-12.pdf (finding that the Portland, Oregon, Police Bureau engages in a pattern or practice of unnecessary or unreasonable force during interactions with individuals who have or are perceived to have disabilities, *i.e.*, mental illness).

[4]      According to the 2011-2012 U.S. Department of Education Civil Rights Data Collection, students with disabilities and minority students are disproportionately referred to law enforcement and involved in school related arrests.  U.S. Dep't of Educ. Office for Civil Rights, *Civil Rights Data Collection: Data Snapshot (School Discipline)* 1 (Mar. 21, 2014), *available at* http://ocrdata.ed.gov/Downloads/CRDC-School-Discipline-Snapshot.pdf.  While only representing 12% of the nationwide student population, children with disabilities as defined by the Individuals with Disabilities Education Act represent 25% of arrests and referrals to law enforcement, and represent 75% of students subjected to physical restraint.  *Id.* at 7, 11.  Similarly, while representing 49.3% of the nationwide student population, minority children account for 61.3% of school arrests and 59.3% of referrals to law enforcement.  *Id.* at 6.

[5]      Press Release, Department of Justice Office of Public Affairs, Attorney General Holder, Secretary Duncan Announce Effort to Respond to School-to-Prison Pipeline by Supporting Good Discipline Practices (Jul. 21, 2011), *available at* http://www.justice.gov/opa/pr/attorney-general-holder-secretary-duncan-announce-effort-respond-school-prison-pipeline.  *See also* Loretta Lynch, Att'y Gen., Remarks at the White House Convening on School Discipline (Jul. 22, 2015), *available at* http://www.justice.gov/opa/speech/attorney-general-loretta-e-lynch-delivers-remarks-white-house-convening-school-discipline (noting ongoing efforts by the Department of Justice, the Department of Education, and the Department of Health and Human Services "to improve school climates, to respond early and appropriately to student mental health and behavioral needs and to avoid referring students to law enforcement and juvenile justice as a disciplinary response.").

[6]      Consent Order Between the United States and the Meridian Municipal Separate School District,

secured a consent order with Huntsville City Schools in Alabama, requiring, among other things, that the district reform its use of SROs to ensure that school officials, rather than law enforcement, handle student misconduct that does not threaten the safety of others.[7]

Additionally, in January 2014, the Department of Justice, in collaboration with the Department of Education, released a school discipline guidance package to assist states, school districts, and schools to comply with federal law and avoid perpetuating the school-to-prison pipeline, including guidance on the appropriate use of SROs.[8]  The Departments of Justice and Education are providing other technical assistance and guidance to encourage education, police, and juvenile justice officials to work together to prevent youth arrests or referrals to the juvenile justice system for minor school-based offenses.[9]

The principles that undergird the United States' civil rights enforcement and technical assistance efforts are also reflected in the grantmaking activities of the Department of Justice Office of Community Oriented Policing Services ("COPS Office"), which provides funding for districts deciding to employ SROs.[10]  Grantees receiving these funds must ensure that their

---

*Barnhardt v. Meridian School District*, No. 4:65-cv-01300-HTW-LRA (S.D. Miss. May 30, 2013), *available at* http://www.justice.gov/crt/about/edu/documents/classlist.php#race; Settlement Agreement Between the United States and the City of Meridian, *United States v. City of Meridian, et. al*, No. 3:13-CV-978-HTW-LRA (Sept. 18, 2015), *available at* http://www.justice.gov/crt/file/778016/download; Settlement Agreement Between the United States and the State of Mississippi Department of Human Services and Division of Youth Services, *United States v. City of Meridian, et. al*, No. 3:13-CV-978-HTW-LRA (Sept. 18, 2015), *available at* http://www.justice.gov/crt/file/778001/download.

[7]     Consent Order Between the United States and Huntsville Board of Education, *Hereford & United States v. Huntsville Board of Education*, NO. 5:63-cv-00109-MHH (N.D. Ala. Apr. 24, 2015), a*vailable at* http://www.justice.gov/sites/default/files/crt/legacy/2015/07/13/huntsvilleconsentorder.pdf.

[8]     *ED-DOJ School Discipline Guidance Package*, U.S. Dep't of Educ. and U.S. Dep't of Justice (Jan. 8, 2014), a*vailable at* http://www2.ed.gov/policy/gen/guid/school-discipline/fedefforts.html#guidance.

[9]     *See Supportive School Discipline Initiative*, National Clearinghouse on Supportive School Discipline, *available at* http://supportiveschooldiscipline.org/learn/reference-guides/supportive-school-discipline-initiative-ssdi (last visited Sept. 22, 2015).

[10]    The Department of Justice has launched a number of collaborative programs aimed at providing support

SROs do not contribute to the school-to-prison pipeline by arresting or citing students for minor, nonviolent behavioral violations or becoming involved in administrative discipline of students.[11]  The COPS Office also actively supports training for current and future SROs around the country, including those who are not funded with COPS grants, regarding their role in the school setting.  As part of these ongoing training efforts, the COPS Office has provided grant money for the development of a training curriculum for SROs.[12]

Additionally, pursuant to Title II of the ADA, 42 U.S.C. §§ 12131-12134, the Department of Justice wrote and enforces regulations that prohibit disability discrimination by state and local government entities.  28 C.F.R. Part 35 (2015).  The Department's interpretation of its Title II regulations has been accorded substantial deference.  *See Johnson v. City of Saline*, 151 F.3d 564, 570 (6th Cir. 1998) ("Congress gave the Attorney General the task of developing regulations to implement Title II. . . .  Because of this express delegation, these regulations are entitled to 'controlling weight, unless they are arbitrary, capricious, or manifestly contrary to the statute.'" *(quoting Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843-44 (1984)).  Thus, the United States has a special

---

and funding for school safety programs. *See, e.g., COPS Hiring Program*, U.S. Dep't of Justice, *available at* http://www.cops.usdoj.gov/Default.asp?Item=2367 (providing funding for the hiring and rehiring of school resource officers) (last visited Set. 18, 2015); U.S. Dep't of Justice, *Comprehensive School Safety Initiative Awards for FY 2014*, at 1, 8, 21 (Oct. 2014), *available at* http://nij.gov/topics/crime/school-crime/documents/comprehensive-school-safety-initiative-awards-fy-2014.pdf (securing $75 million in 2014 to fund 24 research projects aimed at improving school safety nationwide, including two studies on the effectiveness of SROs); U.S. Dep't of Justice, *OJJDP FY 2014 School Justice Collaboration Program: Keeping Kids in School and Out of Court* 6-7 (May 20, 2014), *available at* http://www.ojjdp.gov/grants/solicitations/FY2014/SJCPKeepingKidsinSchool.pdf  (providing funding for, among other objectives, the collaboration of local law enforcement, courts, and education stakeholders, such as the training of school resource officers).

[11]      *See* U.S. Dep't of Justice Office of Community Oriented Policing Services, *2015 COPS Hiring Program (CHP) Application Guide* 27 (May 2015), *available at* http://www.cops.usdoj.gov/pdf/2015AwardDocs/chp/CHP_AppGuide.pdf.

[12]      *See id.* at 11.

interest in the subject matter at issue in this case and how courts construe the protections of the Fourth Amendment and the ADA when law enforcement officers interact with schoolchildren.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs in this case, S.R. and L.G. (together, the "children"), are two young elementary school students with disabilities who are enrolled in public school in Kenton County, Kentucky.  Complaint ¶ 12, 13, ECF No. 1 (Aug. 3, 2015) ("Compl.").[13]  Defendants are the Sheriff's Office, Kenton County Sheriff Charles Korzenborn ("Defendant Korzenborn"), and Defendant Sumner.  Compl. ¶ 14-16.  On three separate occasions, after the children exhibited conduct arising from their disabilities, Defendant Sumner handcuffed them in school.  Compl. ¶¶ 2, 26, 31, 43, 44, 49, 50.

Specifically, during the fall of 2014, at the time of his handcuffing, S.R. was eight years old and was in third grade at a Kenton County public school.  Compl. ¶¶ 21.  S.R. was approximately three and a half feet tall and weighed approximately 52 pounds.  Compl. ¶ 21.  S.R. had been diagnosed with attention deficit hyperactivity disorder ("ADHD") and post-traumatic stress disorder ("PTSD"), both of which are disabilities under the ADA.  Compl. ¶¶ 12, 23, 25.  By October 2013, school personnel acknowledged that S.R. needed a behavior intervention plan to help him manage his disability-related behaviors.  Compl. ¶ 24.  Because of his disabilities, S.R. has difficulty staying focused, paying attention, controlling behavior, complying with directives, and remaining seated, and experiences distress associated with traumatic experiences.  Compl. ¶ 23, 25.

---

[13]    The school district is not a defendant in this case.  The United States does not take a position on the Plaintiffs' factual allegations about the school district's use of restraint or other aversive techniques on students with disabilities.

In the fall of 2014, L.G. was nine years old and in fourth grade in another school in the same district.  Compl. ¶ 39.  She weighed approximately 56 pounds.  Compl. ¶ 39.  In November 2012, L.G. was diagnosed with ADHD.  Compl. ¶ 40. Beginning in 2013, L.G. had a Section 504 education plan, which included strategies to help with her behavior.[14] Compl. ¶ 41.  Because of her disabilities, L.G. is hyperactive and impulsive and has difficulty paying attention, complying with directives, controlling emotions, and remaining seated.  Comp. ¶ 40.  She has a history of hospitalization for mental health crises.  Compl. ¶ 40.

Toward the beginning of the 2014 school year, Defendant Korzenborn entered an agreement to provide four officers, including Defendant Sumner, to serve as SROs for schools in the district.  Compl. ¶ 18.  Neither the Sheriff's Office nor Defendant Korzenborn provided training or created policies or procedures for the SROs on the use of physical force, including the use of handcuffs, on children, including children with disabilities.  Compl. ¶19.

On November 13, 2014, Deputy Sumner was at S.R.'s school.  Compl. ¶ 26, 29.  That day, S.R. experienced disability-related difficulties complying with instructions from his teacher and vice principal, and was sent to the vice principal's office.  Compl. ¶ 26.  While there, S.R. attempted to leave the room, but could not do so, as school personnel held the door closed and restrained S.R. twice.  Compl. ¶ 28.  S.R. tried to leave the room again, saying he needed to use the restroom.  Compl. ¶ 29.  Shortly thereafter, he calmed down after speaking with his mother by phone.  Compl. ¶ 29.  Defendant Sumner then arrived and took S.R. to the restroom.  Compl. ¶ 29.  When S.R. returned from the restroom, he had difficulty following

---

[14]     Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, prohibits discrimination on the basis of disability by recipients of federal financial assistance.  In the elementary and secondary education context, Section 504 requires among other things that school districts that receive federal financial assistance provide qualified students with disabilities with a free appropriate public education.  *See* 34 C.F.R. §§ 104.3(l), 104.33.  Schools often document services to ensure the provision of a free appropriate public education under Section 504 in written plans which are sometimes referred to as Section 504 plans.

Defendant Sumner's instructions, including an instruction to sit down.  Compl. ¶ 30.

Defendant Sumner then handcuffed S.R. behind his back, above his elbows, at his biceps, for

approximately 15 minutes.  Compl. ¶ 31.  In a description of the incident several months later,

Defendant Sumner alleged that S.R. had swung his arm, attempting to strike Defendant

Sumner, but that the SRO blocked the child's elbow with his hand.  Compl. ¶ 30.

According to Plaintiffs' Complaint, video footage of S.R.'s handcuffing[15] depicts

Defendant Sumner saying to the child:  "You can do what we ask you to or you can suffer the

consequences."  Compl. ¶ 32.  The video also allegedly shows Defendant Sumner pushing on

the chain of the handcuffs to place S.R. in a chair and telling him, "Now sit down like I asked

you to."  Compl. ¶ 33.  Defendant Sumner also said to S.R.:  "You know you're . . . going to

behave the way you're supposed to or you suffer the consequences.  It's your decision to

behave this way.  If you want the handcuffs off, you're going to have to behave and ask me

nicely."  Compl. ¶ 34.  Throughout the interaction, the video depicts S.R. crying in pain,

gasping, and squirming in his chair.  Compl. ¶ 34.

When S.R.'s mother arrived to take the child home, Defendant Sumner threatened to

return with his handcuffs if S.R. did not behave.  Compl. ¶ 36.  As a result of his handcuffing,

S.R. experienced pain and suffered, and continues to suffer, emotional distress.  Compl. ¶ 38.

L.G.'s first handcuffing was similar to S.R.'s.  On October 3, 2014, L.G. experienced

disability-related difficulties complying with her teacher's directions and was sent to the school

---

[15]     Although Plaintiffs filed, in conjunction with their complaint, three videos of the events in question with
respect to S.R., those videos are under seal with the Court.  *See* Order, ECF No. 11, at 1-2 (Aug. 5, 2015)
(deeming the first two videos, ECF No. 2, 3, sealed); Order, ECF No. 26, at 2 (Aug. 18, 2015) (ordering the third
video, ECF No. 27, to be filed under seal).  Accordingly, the United States does not rely on this video footage.
The United States also takes no position on the Defendants' assertion that the Court may rely on these videos in
lieu of accepting the facts in the Complaint as true.  Defs.' Joint Mem. in Supp. of Mot. to Dismiss the Compl. for
Failing to State a Claim and Based on Qualified Immunity for Kevin Sumner, Individually at 5-6, Sept. 3, 2015,
ECF No. 29-1 ("Defs.' Mot.").

isolation room.  Compl. ¶ 43.  When she tried to leave the room, the principal and vice principal restrained her.  Compl. ¶ 43.  Thereafter, Defendant Sumner arrived and handcuffed L.G. in the same manner he had handcuffed S.R. – behind her back, above her elbows, around her biceps – for approximately 20 minutes.  Compl. ¶ 44.

L.G. experienced a significant mental health crisis in response to the handcuffing.  Compl. ¶ 45.  She cried and struggled against the handcuffs.  Compl. ¶ 45.  L.G. was taken to the hospital for psychiatric assessment and treatment.  Compl. ¶ 45.  Several months after the incident, Defendant Sumner stated that he handcuffed L.G. because she was trying to "injure the school staff" while being restrained.  Compl. ¶ 44.

Less than three weeks later, on October 23, 2014, Defendant Sumner again handcuffed L.G. after she exhibited conduct arising from her disability.  Comp. ¶¶ 48, 49, 50.  That day, L.G. was heading in the direction of the cafeteria, as the principal had instructed her to do.  Compl. ¶ 48.  While L.G. was standing outside the cafeteria with the principal watching her, Defendant Sumner approached and instructed her to enter.  Compl. ¶ 49.  L.G., who had remained traumatized by her prior encounters with Defendant Sumner, ran away.  Comp. ¶ 49.  Defendant Sumner followed her.  Compl. ¶ 49.  Thereafter, Defendant Sumner and the principal restrained L.G. while she resisted and struggled.  Compl. ¶ 50.  Defendant Sumner then handcuffed L.G. behind her back, above her elbows, around her biceps.  Compl. ¶ 50.  L.G. remained on the floor, handcuffed and struggling, for approximately 30 minutes.  Compl. ¶ 50.  Months later, Defendant Sumner alleged that he handcuffed L.G. because she had attempted to assault him.  Compl. ¶ 50.

When L.G.'s mother arrived, she saw Defendant Sumner hold L.G.'s handcuffed hands over her head, in a shoulder hyperextension position, a pain compliance technique.

Compl. ¶ 51.  As a result of both handcuffings, L.G. suffered pain, and suffered, and continues

to suffer from, emotional distress.  Compl. ¶¶ 47, 54.

      Plaintiffs filed their Complaint on August 3, 2015, alleging that the actions of

Defendants violated their rights under the Fourth and Fourteenth Amendments and the ADA.

Compl. ¶¶ 1, 55-79.  Defendants filed their joint motion to dismiss, ECF No. 29, on

September 9, 2015.  Plaintiffs filed their response and a cross motion for partial judgment on

the pleasings on September 30, 2015, ECF Nos. 30, 31.

## DISCUSSION

I.    **In Evaluating Plaintiffs' Claims, the Court Should be Cognizant of Appropriate Limits on the Role and Responsibilities of School Resource Officers**

      An improperly implemented SRO program can unnecessarily exacerbate the school-to-

prison pipeline and cause significant harm to students.  In the absence of sufficient training and

clear policies to limit SROs' duties and ensure that educators, rather than SROs, are

responsible for student behavior and discipline, officials are more likely to criminalize minor

school infractions and to push students unnecessarily into the school-to-prison pipeline.[16]

Students can suffer lasting harmful consequences after an interaction with law enforcement.

Indeed, students who experience coercive force by those in the criminal justice system are

more likely to miss critical instructional time, struggle in class, disengage from learning, feel

stigmatized or alienated, drop out, become involved in the juvenile justice system, and miss

---

[16]     Lisa H. Thurau & Johanna Wald, *Controlling Partners: When Law Enforcement Meets Discipline in Public Schools*, 54 N.Y.L. SCH. L. REV. 977, 980 (2009/2010); Johanna Wald & Lisa Thurau, *First, Do No Harm: How Educators and Police Can Work Together More Effectively to Keep Schools Safe and Protect Vulnerable Students*, Charles Hamilton Houston Institute for Race and Justice 1 (2010) [hereinafter *First, Do No Harm*], *available at* http://www.charleshamiltonhouston.org/wp-content/uploads/2013/11/FINAL-Do-No-Harm.pdf; U.S. Dep't of Education, *Guiding Principles: A Resource Guide for Improving School Climate and Discipline*, 9-11 (Jan. 2014) [hereinafter *Guiding Principles*], *available at* http://www2.ed.gov/policy/gen/guid/school-discipline/guiding-principles.pdf.

future educational opportunities.[17]  They face a greater risk of drug use, emotional difficulties,

and low self-esteem.[18]  These law enforcement interactions can leave students feeling

traumatized, anxious, humiliated, and deeply fearful of school.[19]  For children with disabilities,

who may experience disproportionate contact with law enforcement in schools,[20] such

interactions can exacerbate the disability and the very behaviors that led to the SRO

interaction.[21]

Best practices developed for implementing SRO programs demonstrate that, in efforts

designed to help promote a safe learning environment in school, the role of SROs should be

carefully circumscribed to ensure they do not become involved in routine disciplinary matters.

SROs should use their law enforcement powers judiciously, to focus on safety, to avoid

disability-based discrimination, and to avoid unnecessary criminalization of childhood

behavior and perpetuation of the school-to-prison pipeline.  These practices, if implemented,

help ensure that schools and law enforcement agencies effectively protect school safety while

avoiding violations of the federal rights of students.  Some of these practices are discussed

---

[17]     *See* Udi Ofer, *Criminalizing the Classroom: The Rise of Aggressive Policing and Zero Tolerance Discipline in New York City Public Schools*, 56 N.Y.U. L. REV. 1373 (2011/2012); *see also* Deb Delisle, *Asst. Secretary Delisle and Youth Lend Their Voices to Combatting the School-to-Prison Pipeline*, U.S. Dep't of Education, *available at* http://www.ed.gov/blog/2012/12/asst-secretary-delisle-and-youth-lend-their-voices-to-combatting-the-school-to-prison-pipeline/; U.S. Dep't of Education and U.S. Dep't of Justice, *Dear Colleague Letter: Nondiscrimatory Administration of School Discipline* 4 (Jan. 8, 2014) [hereinafter *Dear Colleague Letter*], *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201401-title-vi.html.

[18]     Ofer, *supra* note 17, at 1401; *See* Matthew Theriot, *School Resource Officers and the Criminalization of Student Behavior,* 37 J. OF CRIM. JUSTICE 280, 280 (2009) (listing several studies on the effects of criminalization of student behavior).

[19]     *First, Do No Harm, supra* note 16, at 13.

[20]     *Guiding Principles, supra* note 16, at 9.

[21]     *School-to-Prison Pipeline*, Disability Rights Washington, *available at* http://www.disabilityrightswa.org/school-prison-pipeline.

below and should be considered when assessing the reasonableness of the Defendants' actions and policies in this matter.

### A.      School Resource Officers Should Not Criminalize Behavior that School Officials Could Properly Handle

An SRO's role "should be focused on school safety, with the responsibility for addressing and preventing serious, real, and immediate threats to the physical safety of the school and its community."[22]  SROs should not enforce the school code of conduct or engage in routine discipline of students; indeed, the authority and responsibilities of disciplinarian fall squarely in the hands of school administrators.[23]  This is particularly important when SROs are assigned to elementary schools, because in most elementary schools actual threats to physical safety are extremely rare.[24]

SROs should use law enforcement actions, such as arresting students, only as a last resort and only for serious criminal conduct or when necessary to protect students and staff from a threat of immediate harm.[25]  Because of their inherent power in the school setting, SROs should be particularly careful not to escalate or criminalize age-appropriate childhood behavior and should leave routine discipline to school officials.[26]  Proper training and an

---

[22]      *Guiding Principles*, *supra* note 16, at 10.

[23]      *See, e.g.*, U.S. Dep't of Justice Office of Community Oriented Policing Services, *Fact Sheet, Memorandum of Understanding for School-Based Partnerships* 1, 2 (Sept. 2014) [hereinafter *Fact Sheet*], *available at* http://www.cops.usdoj.gov/pdf/2014_MOU-FactSheet_v3_092513.pdf; *Guiding Principles*, *supra* note 16, at 10.

[24]      According to data reported to the National Center for Education Statistics, 80% of elementary schools reported no crimes to the police involving violence during the 2009-10 school year and .7% of elementary schools reported more than 20 such crimes.  U.S. Dep't of Educ. Nat'l Ctr. For Educ. Statistics, *Digest of Education Statistics Tale 229.60* (Sept. 2013), *available at* http://nces.ed.gov/programs/digest/d14/tables/dt14_229.60.asp.

[25]      *See, e.g.*, *Fact Sheet*, *supra* note 23, at 1.

[26]      *See Dear Colleague Letter*, *supra* note 17, at 27.

explicit delineation of an SRO's limited role is critical to forging a successful school/SRO partnership that minimizes the potential risks of having a law enforcement presence at a school, such as improper criminal responses to disability-related behavior and exacerbation of the school-to-prison pipeline.[27]

**B.     School Resource Officers Should Have Clearly Defined Roles and Specialized Training**

To be effective, SROs and law enforcement agencies need to ensure that their responsibilities in the school setting are clearly delineated.  As noted above, an SRO should not be an enforcer of school codes of conduct or become a substitute for traditional in-school discipline.[28]  Where it is necessary for an SRO to intervene to protect safety, the officer should deploy a range of non-punitive alternatives and select the least coercive measure for each incident.[29]

SROs should receive specialized training to prepare for the unique challenges and demands of working with children, especially children with disabilities.[30]  "Children and adolescents' responses differ from adults because of fundamental neurobiological factors and related developmental stages of maturation."[31]  An SRO should receive as much pre-service

---

[27]     *See generally id.*; *First, Do No Harm, supra* note 16; *Guiding Principles, supra* note 16 at 9-11.

[28]     *Dear Colleague Letter, supra* note 17, at 27; *Guiding Principles, supra* note 16, at 10.

[29]     *First, Do No Harm, supra* note 16, at 12.

[30]     The Council of State Governments Justice Center, *The School Discipline Consensus Report: Strategies from the Field to Keep Students Engaged in School and out of the Juvenile Justice System* 234 (2014), *available at* https://csgjusticecenter.org/wp-content/uploads/2014/06/The_School_Discipline_Consensus_Report.pdf.

[31]     Lisa Thurau, *Putting a Developmental Approach into Practice* (Jan. 2013), *available at* http://jjie.org/putting-developmental-approach-into-practice/101741/.

training as possible before he or she ever enters a school, as well as continued training and proper monitoring throughout his or her work.[32]

It is particularly important that SROs be trained to recognize and respond appropriately to youth behavior that may be a manifestation of disability.  Indeed, appropriate training can help law enforcement agencies avoid interactions that violate children's rights under federal civil rights laws, including the ADA.  *See, e.g., Lewis v. Truitt*, 960 F. Supp. 175, 178 (S.D. Ind. 1997) ("In order to comply with the non-discrimination mandate [of the ADA], it is often necessary to provide training to public employees about disability.").  Discriminatory treatment, such as arrests for disability-related behavior that law enforcement officers may perceive as criminal, "can be avoided by proper training."  H.R. Rep. No. 101-485, pt. III, 101st Cong., 2nd Sess. 50, reprinted in 1990 U.S.C.C.A.N. 473.  While law enforcement officers are charged with addressing risks to safety when they arise, to comply with the ADA, it is critical that officers receive training to "distinguish behaviors that pose a real risk from behaviors that do not."[33]  Appropriate training is also often essential to ensuring that law enforcement officers' conduct comports with the ADA's requirement that public agencies make reasonable modifications to policies, programs, and procedures when necessary to avoid disability-based discrimination.[34]

---

[32]      *Guiding Principles, supra* note 16, at 10; The Council of State Governments Justice Center, *supra* note 30, at 234.

[33]      U.S. Dep't of Justice, *Commonly Asked Questions About the Americans with Disabilities Act and Law Enforcement*, § II.6 (Apr. 4, 2006) [hereinafter *DOJ Law Enforcement Guidance*], *available at* http://www.ada.gov/q&a_law.htm.

[34]      *See* 28 C.F.R. §35.130(b)(7); *see also* Council of State Governments Justice Center, *supra* note 30, at 235  (Noting that training plays an important role in determining how school police officers exercise their often "considerable discretion in how to respond to minor offenses," and recommending training on such matters as "mental health interventions," training on "children with disabilities and special needs, including familiarity with federal laws," and "de-escalation techniques and alternatives to arrest.")  The Council recommendations are consistent with the SRO hiring grant requirements of the Department of Justice COPS Office, noted *supra* p. 5-6.

II.     **In Evaluating Plaintiffs' Fourth Amendment Claims, the Court Must Consider Whether Defendant Sumner's Handcuffing of Two Elementary Schoolchildren With Disabilities Was Objectively Reasonable**

Plaintiffs allege that Defendant Sumner violated S.R. and L.G.'s Fourth and Fourteenth Amendment rights.  The Fourth Amendment guarantees individuals the right to "be secure in their persons . . . against unreasonable . . . seizures . . ."  U.S. Const. amend. IV.[35]  The constitutionality of a Fourth Amendment seizure hinges on objective reasonableness.[36]  The Court must determine whether Defendant Sumner's actions – handcuffing two elementary school children with disabilities, behind their backs and around their biceps, for failure to follow instructions – were objectively reasonable.

A.     **The Court Must Consider Whether an Objectively Reasonable Officer Would Have Seized S.R. and L.G. by Handcuffing Them for Their Misbehavior**

Defendant Sumner seized S.R. and L.G. each time he handcuffed them.[37]  The parties do not dispute that each handcuffing incident was a seizure.  Defs.' Joint Mem. in Supp. of

---

[35]     The Fourth Amendment applies to the states through the Fourteenth Amendment.  *See* U.S. Const. amend. XIV; *Camara v. Mun. Ct.*, 387 U.S. 523, 528 (1967).

[36]     A use of force is a type of seizure.  *Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that "*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment") (emphasis in original); *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment"); *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006) ("police officers seize those persons who are the deliberate object of their exertion of force.") (citation and internal quotation marks omitted).  In analyzing claims of excessive force, the Sixth Circuit applies the Fourth Amendment's unreasonable seizure jurisprudence.  *Baynes v. Cleland*, No. 14-2235, 2015 WL 5000615, at *5 (6th Cir. Aug. 24, 2015); *Morrison v. Bd. of Trs.*, 583 F.3d 394, 400-401 (6th Cir. 2009).  Accordingly, this same standard applies to Plaintiffs' use of force claims.  *See Graham*, 490 U.S. at 398; *Garner*, 471 U.S. at 8-9; *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 606-07 (6th Cir. 2006).

[37]     A seizure triggering the Fourth Amendment's protections occurs when government actors have, "by means of physical force or show of authority," in some way restrained the liberty of a citizen.  *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).  Generally, a seizure occurs when, in light of all the surrounding circumstances, "a reasonable person would have believed that he was not free to leave."  *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (citations and internal quotation marks omitted).  In the school context, "the limitation on [a] student's freedom of movement must significantly exceed that inherent in every-day, compulsory attendance."  *Couture v. Board of Educ.*, 535 F.3d 1243, 1251 (10th Cir. 2008); *H.M. v. Bd. of Educ. of the Kings Local Sch. Dist.*, No.

Mot. to Dismiss the Compl. for Failing to State a Claim and Based on Qualified Immunity for

Kevin Sumner, Individually at 10, Sept. 3, 2015, ECF No. 29-1 ("Defs.' Mot.") ("The

Defendants agree that a seizure occurred and that handcuffs were utilized . . . during each of

the three occurrences described in the complaint.").  The standard for evaluating the

constitutionality of a seizure by a law enforcement officer is "objective reasonableness."

*Graham v. Connor*, 490 U.S. 386, 398 (1989).  To determine whether a seizure was objectively

reasonable, a court must pay "careful attention to the facts and circumstances" of the particular

case.  *Id.* at 396.  Such facts and circumstances include:  (1) the severity of the crime at issue,

(2) whether the suspect poses an immediate threat to the safety of the officers or others, and

(3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  *Id.*

These enumerated factors are not exhaustive; the ultimate inquiry is whether the seizure is

justified under "the totality of the circumstances."  *Tennessee v. Garner*, 471 U.S. 1, 8-9

(1985); *Baker v. City of Hamilton*, 471 F.3d 601, 606-07 (6th Cir. 2006) (citations omitted).

　　To be sure, the holistic inquiry of objective reasonableness requires "a careful

balancing of the nature and quality of the intrusion on the individual's Fourth Amendment

interests against the countervailing governmental interests at stake."  *Graham* 490 U.S. at 396

(citation and internal quotation marks omitted); *Baker*, 471 F.3d at 606 (citation and internal

quotation marks omitted).  The Supreme Court has described the balancing of these competing

interests as "the key principle of the Fourth Amendment."  *Garner*, 471 U.S. at 8-9 (quoting

*Michigan v. Summers*, 452 U.S. 692, 700 n.12 (1981) (internal quotation marks omitted).

"Because one of the factors is the extent of the intrusion, it is plain that reasonableness depends

on not only when a seizure is made, but also how it is carried out."  *Garner*, 471 U.S. at 7-8

---

1:14-CV-64, 2015 WL 4624269, at *8 (S.D. Ohio Aug. 3, 2015).

(citing *United States v. Ortiz,* 422 U.S. 891, 895 (1975); *Terry v. Ohio,* 392 U.S. 1, 28-29 (1968)) (internal quotation marks omitted).

A law enforcement officer's conduct must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *Morrison v. Bd. of Trs. of Green Twp.,* 583 F.3d 394, 401 (6th Cir. 2009) ("The Court should judge the lawfulness of the conduct from the perspective of a reasonable officer on the scene.") (citation and internal quotation marks omitted).[38]

In their Motion to Dismiss, Defendants agree that the Court must evaluate Deputy Sumner's conduct under the Fourth Amendment's objective reasonableness standard. Defs.' Mot. at 8 ("The reasonableness of Deputy Sumner's conduct must be analyzed under the rubric of the Fourth Amendment, the same as any other police officer's conduct would be."). Improperly, however, Defendants then appear to urge the Court to ignore that standard by arguing that, because Defendant Sumner subjectively believed that he had probable cause to arrest both children under Kentucky law, his seizures of the children were lawful. *See* Defs.' Mot. at 11-15. Defendants are mistaken.

---

[38] Some courts have applied the reasonable suspicion standard articulated in *New Jersey v. T.L.O.*, 469 U.S. 325 (1985) to searches and seizures by law enforcement officers in schools. *See Hoskins v. Cumberland Cnty. Bd. of Educ.*, No. 2:13-CV-15, 2014 WL 7238621, at *6-7 (M.D. Tenn. Dec. 17, 2014) (collecting cases). In *T.L.O.*, the Supreme Court held that, in the school context, the more relaxed standard of reasonable suspicion, rather than the traditional standard of probable cause, applied to searches of students by school officials. 469 U.S. at 341. The Sixth Circuit has not addressed whether *T.L.O.*'s standard applies to law enforcement officers' decisions to detain children in school settings. The United States takes the position that seizures by law enforcement officers, whether they occur on or off school grounds, are law enforcement actions that have the potential to deprive individuals of their liberty. As such, they should be afforded the highest level of constitutional protection. *See Hoskins*, No. 2:13-CV-15, 2014 WL 7238621, at *10 ("when a law enforcement official seizes a child at school, it is more likely that the seizure is a law-enforcement action, not an action for the purposes of educating a child. That is particularly true [here, where] . . . the law enforcement officer used law-enforcement tools—handcuffs— for the stated purpose of arresting a child and taking him to detention."); *see also Wallace by Wallace v. Batavia Sch. Dist.* 101, 68 F.3d 1010, 1014 (7th Cir. 1995) (noting distinction between education as the "basic purpose for the deprivation of a student's personal liberty by a teacher," and "investigation or apprehension" as "the basic purpose for the deprivation of liberty of a criminal suspect by a police officer.") In any event, the two standards are "quite similar" as applied to the means of effecting seizures, *Hoskins*, No. 2:13-CV-15, 2014 WL 7238621, at *11, and would result in the same conclusion in this case. Indeed, the nucleus of both standards is the requirement that the court consider the reasonableness of the officer's actions.

First, even if state law permitted a seizure based on an officer's subjective belief, it would have no bearing on whether the officers violated the federal Constitution. *Sibron v. New York*, 392 U.S. 40, 60-61 (1968) (noting that, although a state is free to develop its own search and seizure law, a state may not "authorize police conduct which trenches upon Fourth Amendment rights . . . . The question . . . is not whether the search (or seizure) was authorized by state law. The question is rather whether the search was reasonable under the Fourth Amendment. . . . [A] search authorized by state law may be an unreasonable one under that amendment . . . .") (citations and internal quotation marks omitted); *C.B. v Sonora*, 769 F.3d 1005, 1031 (9th Cir. 2014) (rejecting officers' argument that, because seizure of a child was reasonable under state law, their use of handcuffs was also reasonable); s*ee California v. Greenwood,* 486 U.S. 35, 43 (1988) ("We have never intimated . . . that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs").

Second, even assuming the officer had probable cause, that alone would not make the decision to handcuff the children reasonable. *See Hoskins v. Cumberland Cnty. Bd. of Educ.*, No. 2:13-CV-15, 2014 WL 7238621, at *7-8 (M.D. Tenn. Dec. 17, 2014) (rejecting SRO's argument that handcuffing child was lawful because the SRO intended to arrest the child, and noting that the unreasonable seizure claim must be addressed separately, under the *Graham* standards); *see also Garner,* 471 U.S. at 7-8 (holding that the presence of probable cause does not eliminate the Fourth Amendment's requirement to consider the reasonableness of the manner in which the seizure is conducted).

**B.     Plaintiffs Have Alleged Facts Sufficient to State a Claim That Defendant's Handcuffing of S.R. and L.G. Was Unreasonable**

In considering the reasonableness of Defendant Sumner's conduct, the Court must consider the particularized facts and circumstances, including:  the youth of the children and the fact that the incidents occurred at school; the three factors specifically articulated in *Graham, i.e.*, the severity of the alleged crime, whether the children posed a safety threat, and whether the children were actively resisting arrest or attempting to evade arrest by flight; the children's disabilities; the extent and risks of the intrusion by handcuffing compared to the countervailing government interests; the punitive purpose of the defendant's actions; the duration of the handcuffings; and the appropriate role of an SRO in a school.

**1.     The Age of the Children and the School Setting**

To properly analyze Defendant Sumner's actions, "the Court must first consider two factors uniquely relevant to this case as required by *Graham*, namely the very young age of [the children] and the fact that this incident took place in a school setting."  *Hoskins*, No. 2:13-CV-15, 2014 WL 7238621, at *7.  In *Hoskins*, a strikingly similar case, another district court in the Sixth Circuit recently held that an SRO violated the Fourth Amendment rights of T.H., an eight-year-old second grader, when the SRO handcuffed the child in the principal's office following an altercation in gym class. [39]  *Id.*  Considering the totality of the circumstances, including "the very young age of T.H., the nature of the conduct T.H. had engaged in, [and the

---

[39]     In *Hoskins*, T.H., who had previously been diagnosed with anxiety and a mood disorder, threatened his teacher with violence, drew his fist, and swung it in his teacher's direction. No. 2:13-CV-15, 2014 WL 7238621, at *2-4. The child was sent to the principal's office.  *Id.*  There, T.H. again drew his fist back and threatened to hit both the principal and the SRO.  *Id.* at *3. The SRO then handcuffed the child, later testifying that he had intended to take T.H. to juvenile detention, but then changed his mind.  *Id.* at *4.  After T.H.'s parents arrived and talked with the boy and SRO, the SRO removed the handcuffs and released T.H. to his parents.  *Id.* at *4.  By then, T.H. had been handcuffed for 45 minutes.  *Id.* at *4.  The handcuffs left small indentations on T.H.'s wrists and caused soreness and emotional trauma.  *Id.* at *4.

school setting," the court found that the initial handcuffing was not objectively reasonable, and that leaving the child handcuffed for 45 minutes "was even less reasonable." [40] *Id.* The court cautioned that 8-year-old T.H. "*was a startlingly young child to be handcuffed at all*, much less for forty-five minutes, with the stated intention of being taken to juvenile detention and prosecuted for misdemeanor assault." [41] *Id.* (emphasis added).

Other courts similarly have accorded significant weight to the age of the child in considering reasonableness of a seizure.[42]  Indeed, in another similar case, *Gray v. Bostic*, the Eleventh Circuit found an SRO's handcuffing of a nine-year old girl in school for at least five minutes after she physically threatened her gym teacher was excessively intrusive because of factors including her "young age."  458 F.3d 1295, 1306 (11th Cir. 2006); *see also Tekle v. United States*, 511 F.3d 839, 848 (9th Cir. 2007) (denying qualified immunity on excessive force claim where officers used handcuffs to detain unarmed 11-year-old boy during an arrest of his father); *Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir. 1996) (denying summary judgment on excessive force claim when deputy violently jerked compliant 10-year-old girl out of her chair and dragged her into another room during an arrest of her father); *James v. Frederick County Pub. Sch.,* 441 F. Supp. 2d 755, 758-759 (D. Md. 2006) (finding plaintiffs' excessive force allegations sufficient to survive motion to dismiss where officer handcuffed an eight-year-old

---

[40]     The *Hoskins* court also considered the age of the child under an alternative *T.L.O.* analysis, but, as discussed *supra*, these factors are also part of the overall reasonableness inquiry under *Graham*.  *See also supra* note 38 and accompanying text (noting the strong similarities between the traditional Fourth Amendment *Graham* analysis and the *T.L.O.* analysis in the context of school seizures).

[41]     The court found for the defendants on qualified immunity, on the grounds that the plaintiffs failed to meet their burden of demonstrating that the SRO was not entitled to qualified immunity.  *Hoskins*, No. 2:13-CV-15, 2014 WL 7238621, at *13.

[42]     As *Hoskins* noted: "As numerous court decisions demonstrate, although detentions of children have not been held to be unreasonable per se, they do raise additional concerns." *Id.* at *10 (citations and internal quotation marks omitted).

21

with ADHD in school after the child became "severely upset" and teachers could not calm him down).

### 2. The *Graham* Factors

Next, the Court must consider the three factors enumerated in *Graham*.

### a) Severity of the Offense

The first factor is the severity of the crime at issue. The Court needs to consider whether a child who is behaving disruptively, displaying behaviors associated with his or her disability, has committed any crime at all. *See Williams v. Nice*, 58 F. Supp. 3d 833, 838 (N.D. Ohio 2014) (denying qualified immunity to SRO for use of force on an eighth grader who threw a temper tantrum and ripped posters off walls, because it was "debatable" whether he committed any crime at all, and even if any criminal misconduct had occurred, it was, "at most . . . a minor misdemeanor"); *see also Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) (noting that the fact that a plaintiff has committed no crime weighs heavily against a finding of reasonableness).

Specifically, the Court needs to consider whether an eight-year-old child who is hitting and threatening his teacher and displaying "tumultuous behavior, being disruptive, [and] making unreasonable noise," or a nine-year-old who is acting "defiant" and "resisting" adults, is engaging in criminal behavior at all, as Defendants allege. *See* Defs.' Mot. at 13-14. Rather, that child may, instead, be simply engaging in disruptive, but not uncommon, behavior in school, particularly where that behavior arises out of the child's disability – a far cry from the serious felonies of assault and terroristic threatening, and the misdemeanors of harassment and disorderly conduct, that Defendants argue. *See id.* at 12-14. In any event, this case is at the motion to dismiss stage, and it is premature for the Court to make a fact-intensive

determination of whether either child committed a crime in considering the offense severity factor.

### b)    The Level of Threat to Safety

In analyzing the second prong of *Graham* – whether the individual poses a threat to the safety of officers or others – the "size and stature of the parties involved" indicates that Defendant Sumner's conduct may have been unreasonable. *Williams*, 58 F. Supp. 3d. at 838 (citations omitted) (noting that the "significant size discrepancy" between the SRO and an eighth grader who had a tantrum "casts doubt upon Defendants' assertion that [the child] 'displayed a defiant demeanor and assumed a confrontational position toward [the SRO]' by placing her hand on her hip."); *see also Meirthew v. Amore*, 417 F. App'x 494, 497 (6th 2011) (unpublished) (holding that unarmed, five foot, four-inch, 123-pound plaintiff did not pose an immediate threat to five-foot, 10-inch, 230-pound officer); *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 174 (6th Cir. 2004) (finding unarmed, five foot, five inch, 120-pound plaintiff posed no immediate threat to officers who were at least three inches taller and weighed approximately twice as much as plaintiff); *Sonora*, 769 F.3d at 1030 (concluding that 80-pound, four foot, eight inch 11-year-old who was surrounded by four or five adults posed no safety threat).

In reviewing the allegations that S.R. and L.G. tried to hit and injure school staff, Compl. ¶¶ 30, 44, 50, the Court needs to consider whether, under these circumstances, children of S.R. and L.G.'s size and stature in fact posed a safety threat to Defendant Sumner or any of the other grown adults involved in the incidents. The significant size discrepancy between Defendant Sumner, a fully grown man, and S.R., a 3½-foot tall, 52-pound third-grade boy, and

L.G., a 56-pound fourth-grade girl, weighs against a finding of objective reasonableness.  *See* Compl. ¶¶ 21, 39.

### c)        The Level of Resistance

In considering the third *Graham* factor, whether the individual is actively resisting arrest or attempting to evade arrest by flight, the Court needs to focus on whether S.R. and L.G. were flight risks.  *See Sonora*, 769 F.3d at 1030 (use of handcuffs on 11-year-old boy was unreasonable both where the boy was surrounded by up to five adults and was unlikely to run away and when boy was subsequently transported in a locked vehicle).  As discussed above, in two of the three incidents, S.R. and L.G. were confined in rooms that they could not exit. Further, in all three incidents, the children were surrounded by adults who had contained them. Additionally, to the extent the children were struggling against Defendant Sumner or staff, it is questionable that they reasonably could have escaped at all, given that they were just over 50 pounds, unarmed, and already restrained.

### 3.        The Children's Disabilities

As discussed more fully in Section III *infra*, the Court needs to consider whether Defendant Sumner's actions in handcuffing the children were reasonable in light of their disabilities.  *See, e.g.*, *H.M. v. Bd. of Educ. of the Kings Local Sch. Dist.*, No. 1:14-CV-64, 2015 WL 4624269, at *8 (S.D. Ohio Aug. 3, 2015) (in considering a due process violation, which requires the higher threshold of "shocking to the conscience," "[t]he fact that a plaintiff has a disability may bear on whether the amount of force amounts to a due process violation"). Specifically, both children have ADHD, and S.R. also has PTSD.  Compl. ¶¶ 23, 25, and 40. Symptoms of their ADHD include hyperactivity and impulsivity, as well as difficulty staying focused, paying attention, controlling behavior, complying with directives, and remaining

seated. Compl. ¶¶ 23, 40. S.R.'s PTSD caused him to experience "distress associated with traumatic experiences." Compl. ¶ 25. These are the very types of behaviors both children exhibited in the incidents that resulted in the handcuffings. Compl. ¶¶ 26, 43. The Court needs to carefully consider the reasonableness of handcuffing a child who is exhibiting behavior that is a manifestation of his or her disability.[43]

### 4. The Risk of Intrusion Balanced Against the Governmental Interests at Stake

In conducting its reasonableness analysis, the Court needs to balance the competing interests of the nature and quality of the intrusion against the countervailing governmental interests at stake. *Graham* 490 U.S. at 396; *Baker*, 471 F.3d at 606. Handcuffing a young child, particularly a child with a disability, constitutes an extraordinary intrusion. Such interactions are fraught with the potential for lasting trauma and damage. *See., e.g.*, *Hoskins*, No. 2:13-CV-15, 2014 WL 7238621, at *1,4 (eight-year-old second grader allegedly suffered emotional trauma after SRO handcuffed him in school); *James*, 441 F. Supp. 2d at 757 (eight-year-old with ADHD allegedly suffered, and will continue to suffer, emotional trauma requiring professional medical treatment after being handcuffed by an officer in school); *Gray v. Bostic*, No. CIV A 03-C-2989-W, 2004 WL 5624393, at *1 (N.D. Ala. Jan. 30, 2004) (nine-year-old suffered pain, severe embarrassment, crying, humiliation, and a traumatic emotional response after SRO handcuffed her in school), *rev'd on other grounds* 127 F. App'x 472 (11th Cir. 2004) (reversing lower court's grant of summary judgment to the defendants).[44]

---

[43] *See, e.g.*, *DOJ Law Enforcement* Guidance, *supra* note 33, at § I.2 (suggesting that law enforcement officers receive training to distinguish disruptive behaviors that are a result of a disability to prevent criminalizing those behaviors).

[44] *See also Seclusion and Restraints: Selected Cases of Death and Abuse at Public and Private Schools and Treatment Centers: Hearing Before the H. Comm. On Education and Labor*, 111th Cong. 1, 5 (2009) (statement of Gregory D. Kutz, Managing Director of Forensic Audits and Special Investigations at the U.S. Gov't

Plaintiffs allege that S.R. and L.G. suffered, and continue to suffer, physical and emotional pain, psychological injury, trauma, and suffering, and that the children "continue to experience fear, distrust, and anxiety regarding law enforcement" such as SROs.  Compl. ¶ 63. Moreover, both children have emotional disabilities, which can be exacerbated by trauma-inducing experiences like being handcuffed in school.[45]  Indeed, in reaction to her first handcuffing, L.G. "experienced a severe mental health crisis" – so severe that a medical crisis team was called and L.G. was taken to the hospital for a psychiatric assessment and treatment. Compl ¶ 45.  In addition to such exacerbation, the damage of such interactions can also shape children's beliefs and experiences about law enforcement for a lifetime.[46]

These harms outweigh the Defendants' countervailing governmental interests.  Far from dealing with any criminal conduct by the children, Defendant Sumner "was confronted in a school setting with an unruly student—a situation handled by *teachers* on a routine basis

Accountability Office), *available at* http://www.gao.gov/new.items/d09719t.pdf (observing that nearly all allegations of abuse or death resulting from restraint or seclusion reviewed in nationwide study involved children with disabilities, and noting that, even when no physical injury occurs, children are at risk of being "severely traumatized"); GAO/HEHS-99-176, *Improper Restraint or Seclusion Procedures Places People at Risk* (Sept. 1999), *available at* http://www.gao.gov/archive/1999/he99176.pdf (observing that children with mental health and other disorders are at especially high risk for death or serious injury from the use of restraints); U.S. Department of Educ., *Restraint and Seclusion:  Resource Document*, at 12 (May 2012), *available at* http://www.ed.gov/policy/seclusion/restraints-and-seclusion-resources.pdf (recommending that "[s]chools should never use mechanical restraints to restrict a child's freedom of movement").

[45]     *See generally Dear Colleague Letter, supra* note 17; Disability Rights Washington, *supra* note 21 ("discipline practices that restrict access to appropriate education aggravate setbacks for students with disabilities"); Theriot, *supra* note 18, at 280 ("common security measures . . . actually lower students' self esteem and cause emotional distress").

[46]     *See generally* Ben Brown, *Understanding and Assessing School Police Officers: A Conceptual and Methodological Comment*, 34 J. CRIM. JUST. 591, 599 (2006), *available at* http://youthjusticenc.org/download/education-justice/school-policing-security/Understanding%20and%20Assessing%20School%20Police%20Officers_%20A%20Conceptual%20and%20Methodological%20Comment.pdf (using aggressive law enforcement strategies and tools in schools "may cause students to distrust educational and law enforcement authorities which could motivate students to engage in greater delinquency").  As noted above, SROs serve in schools in significant numbers. Nathan James and Gail McCallion, Cong. Research Serv., R43126, *School Resource Officers: Law Enforcement Officers in Schools* 28-29 (2013), *available at* https://www.fas.org/sgp/crs/misc/R43126.pdf (in 2007, 19,000 SROs from police departments and sheriffs' offices served in schools).  Thus, their impact on children and society can be substantial.

without the use of **any** force." *Williams*, 58 F. Supp. 3d at 838 (emphasis in original). Indeed, in cases involving schoolchildren, the Defendants' have interests that weigh heavily against unwarranted intrusions. The Defendants' own interest in protecting schoolchildren from physical, emotional, and educational harm requires that the extreme measure of handcuffing occur only when truly necessary. Consequently, the Court needs to consider whether Defendant Sumner could have used less intrusive means to encourage the children's compliance. *See Sonora*, 769 F.3d at 1010-11 (denying qualified immunity on excessive force claim where, "notwithstanding the fact that [the child] had not disobeyed a single police order, the officers did not explore alternative options for handling the situation before handcuffing him").

### 5. The Purpose of the Handcuffing

Further, as part of the totality of the circumstances, the Court should consider whether the purpose of Defendant Sumner's actions was punitive, rather than necessary to ensure safety. At least one circuit court has held that handcuffing a child in school for the purpose of punishment fails the reasonableness test and amounts to an "obvious violation" of the child's constitutional rights. *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1306 (11th Cir. 2006) (denying qualified immunity to SRO who handcuffed a nine-year-old girl as punishment). Here, as S.R. cried out in pain while handcuffed, Defendant Sumner made statements that the Court could find to be punitive, including: "[Y]ou're . . . going to behave the way you're supposed to or you suffer the consequences. It's your decision to behave this way. If you want the handcuffs off, you're going to have to behave and ask me nicely." Compl. ¶¶ 34 (alterations in original). In addition, after S.R.'s mother arrived, Defendant Sumner threatened to return with his handcuffs if S.R. did not behave. Compl. ¶ 36. Plaintiffs also allege that

Defendant Sumner used the handcuffs on L.G. to "seek compliance," Compl. ¶53, which also suggests a disciplinary or punitive purpose.

### 6.    The Duration of the Handcuffing

Courts look to the duration of a handcuffing as part of the reasonableness determination. *See Hoskins*, No. 2:13-CV-15, 2014 WL 7238621, at *8 (finding that initial handcuffing was not objectively reasonable, and that leaving child handcuffed for 45 minutes "was even less reasonable"); *see also Gray*, 458 F.3d at 1306 (finding five-minute handcuffing unreasonable).

Defendant Sumner handcuffed L.G. for 30 minutes in one incident and 20 minutes in the other. Compl. ¶ 44, 50. He handcuffed S.R. for approximately 15 minutes. Compl. ¶ 31. The Court needs to consider whether a reasonable officer in Defendant Sumner's shoes would handcuff the children at all, much less for 15 to 30 minutes.

### 7.    The Appropriate Role of an SRO

Finally, the Court needs to consider whether Deputy Sumner's actions were reasonable in light of the appropriate role of an SRO at a school. As detailed *supra*, Part I, it is inappropriate for SROs to be involved in violations of school rules and routine discipline of students. Such incidents should be the responsibility of educators. In light of the proper role of an SRO in an elementary school, the Court needs to consider whether a reasonable SRO in Defendant Sumner's shoes would have resorted to handcuffing two children with disabilities who were having difficulty following directions. The Court needs to consider whether such an SRO should criminalize the children's behavior, or whether the misbehavior amounted to routine violations of school rules, which call for a school, rather than a law enforcement, response. *See Williams*, 58 F. Supp. 3d at 838.

### III.   Title II of the ADA Governs Defendants' Conduct

Under Title II of the ADA, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or be denied the benefits of, services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132.  Here, the children allege that the Sheriff's Office discriminates against them in two ways.  First the Sheriff's Office's policies, practices, and procedures related to handcuffing children have a discriminatory effect on children with disabilities who are more susceptible to exhibiting behaviors that may cause police officers to handcuff them.  *See* Compl. ¶ 67.  Second, the children argue that Defendant Sumner failed to make reasonable modifications necessary to avoid disability discrimination, as required under the ADA. Compl. ¶ 70.

In reply, the Sheriff's Office alleges that the seizure of L.G. and S.R. was "objectively reasonable" given the children's actions, and therefore, no reasonable modifications were necessary.  Defs.' Mot. at 22.  The Sheriff's Office further questions whether the ADA even applies to police interactions.[47]  Defs.' Mot. at 22.  As explained more fully below, Title II of the ADA applies to all programs, services, and activities of public entities, including the investigation and arrest practices of the Sheriff's Office and its SROs, and Defendants err in asking this Court to ignore or unreasonably limit the requirements of the ADA.

---

[47]   The Sheriff's Office also contends that the children have not alleged that Defendant Sumner had knowledge of their disabilities.  Defs.' Mot. at 21.  The United States takes no position on this fact question, but notes that it should not be resolved at the motion to dismiss stage.  If the Court allows the Plaintiffs' case to proceed, the extent to which Defendant Sumner had knowledge of the children's disabilities can be explored in discovery.

## A.      The ADA Applies to Interactions Between School Resource Officers and Children with Disabilities

As stated above, a school police officer assigned to work with children has a unique role.  It is important, therefore, that officers have experience working with youth and understand that youths think and act differently than adults.  What is not unique to the school setting, however, is the responsibility of an SRO – the same as all law enforcement officers – to carry out law enforcement responsibilities in a manner that complies with the anti-discrimination mandate of the ADA.  *See Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 209 (1998) (holding that state prisons and other law enforcement agencies are public entities covered under the ADA).  S.R. and L.G. are qualified individuals with disabilities under the ADA and, therefore, are entitled to protections under the statute and its regulations.[48]

Congress enacted the ADA to provide a "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. §12101(b)(1) (1990).  In its findings, Congress observed that discrimination against individuals with disabilities "persists in such critical areas as . . . education . . . and access to public services," and includes "failure to make modifications."  *Id.* §§12101(a)(3), (a)(5).

All of a Sheriff's Office's programs, services, and activities, including its law enforcement activities, are subject to the ADA.  *See Yeskey*, 524 U.S. at 209 (quoting *Procunier v. Martinez*, 417 U.S. 396, 412 (1974)).  Indeed, Congress placed no exceptions in the ADA that would "cast the coverage" of law enforcement agencies or their activities "into doubt."  *See id.*

The legislative history of Title II shows that Congress intended to include police interactions within the reach of the ADA.  The House committee considering the enactment of

---

[48]      As noted in *supra* footnote 1, the United States accepts the factual allegations in the complaint as true.

the ADA urged that Title II should apply to "all actions of state and local governments."  H.R. Rep. No. 485 101st Cong., 2d Sess. Pt. 2, at 84 (1990).  As an example, the committee wrote that police officers often arrest and jail individuals with disabilities because they fail to recognize the individuals' disabilities.  *Id.* Pt. 3, at 50.  The Department of Justice's technical assistance to public entities on ADA compliance has confirmed that Title II applies to "virtually everything that officers and deputies do," including "arresting, booking, and holding suspects."  U.S. Dep't of Justice, *Commonly Asked Questions About the Americans with Disabilities Act and Law Enforcement*, § I.2 (Apr. 4, 2006) ("DOJ Law Enforcement Guidance").[49]  Applying the plain language of the statute, its regulations, and the Department's interpretive guidance, there can be no genuine dispute that Title II of the ADA applies to *all* programs, services, and activities of the Kenton County Sheriff's Department, including the activities and interactions of its school resource officers in the exercise of their duties.

The Sixth Circuit has affirmed that the ADA applies to "all of the activities of a public entity."  *See Johnson v. City of Saline*, 151 F. 3d 564, 569 (6th Cir. 1998) (giving substantial deference to the Department of Justice's interpretation of the ADA).  The Sixth Circuit has also applied the ADA to cases involving police interaction with individuals with disabilities. *See, e.g.*, *Tucker v. Tennessee*, 539 F. 3d 526, 533, 540-42 (6th Cir. 2008) (assuming, without deciding, the applicability of Title II of the ADA to police interactions); *Thompson v. Williamson Cnty.*, 219 F. 3d 555, 557-58 (6th Cir. 2000) (applying the ADA to the police shooting death of a man with mental illness).  Further, the majority of appellate courts

---

[49]     Similarly, courts have held that among the "core functions of government" that are subject to Title II's requirements is "the appropriate use of force by government officials acting under color of law."  *See Schorr v. Borough of Lemoyne*, 243 F. Supp.2d 232, 235 (M.D. Pa. 2003).

considering the applicability of the ADA to law enforcement interactions have held that it does apply.[50]  This Court should reach the same conclusion.

### B.     The ADA Requires SROs to Reasonably Modify Their Practices When Needed to Interact with Students with Disabilities

The ADA requires a public entity, such as a law enforcement agency, to make reasonable modifications to its policies, practices, and procedures when necessary to avoid disability-based discrimination.  28 C.F.R. § 35.130(b)(7).  *See also* DOJ Law Enforcement Guidance § V.  The ADA's reasonable modification requirement applies to interactions between school resource officers and children with disabilities, and this Court should reject Defendants' assertion that this obligation is obviated by Defendant Sumner's "probable cause to arrest" the children or his need to make "on-the-spot decisions" in exercising his duties. Defs.' Mot. 22.

Contrary to Defendants' assertion, the existence of probable cause to arrest an individual is independent of the obligation to make reasonable modifications to law enforcement policies, practices, or procedures where necessary to avoid disability discrimination.  In other words, the existence of probable cause does not end the reasonable modification inquiry – the law enforcement entity must still make an individualized determination as to whether, under the circumstances, making such modifications would fundamentally alter a program, service, or activity.  *Williams v. City of New York,* No. 1:12-cv-

---

[50]     *Seremeth v. Bd. of Cnty. Comm'rs of Frederick Cnty.*, 673 F.3d 333, 338-40 (4th Cir. 2012) ("[t]he ADA applies to the investigation of criminal conduct"); *Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1217 (9th Cir. 2014)) (joining the "majority of other circuits" and holding that the ADA applies to police interactions) *rev'd on other grounds by* 135 S.Ct. 1765 (2015); *Gorman v. Bartch*, 152 F.3d 907, 912-13 (8th Cir. 1998) (finding that a police department is a public entity and an arrest is a program or service); *see Gohier v. Enright,* 186 F.3d 1216, 1221 (10th Cir.1999) (refusing to adopt a "broad rule categorically excluding arrests from the scope of Title II"*); see also Bircoll v. Miami-Dade County,* 480 F.3d 1072, 1085 (11th Cir.2007) (holding that a police department is a public entity prohibited from disability-based discrimination, although declining to decide whether police conduct during an arrest is a program, service or activity covered by the ADA); *but see Hainze v. Richards,* 207 F.3d 795, 801 (5th Cir. 2000) (ruling that Title II does not apply in exigent circumstances).

06805-VEC, 2015 WL 4660691, at *9 (S.D.N.Y. Aug. 5, 2015) (denying summary judgment

to defendants in a case involving the New York City Police Department's alleged failure to

make a reasonable modification leading up to the arrest of a deaf individual, holding: "[E]ven

assuming that a jury finds that there was probable cause to arrest Plaintiff, the City must

establish that providing her an accommodation during the police officers' 'investigation' would

have been 'unreasonable' to rebut Plaintiff's *prima facie* case that an accommodation was

available."); *cf. Waller v. City of Danville*, 556 F.3d 171, 174 (4th Cir. 2009) (noting that

courts have recognized a Title II claim when "police properly arrest a suspect but fail to

reasonably accommodate his disability during the investigation or arrest . . . .").

      The obligation to make reasonable modifications extends through the entire course of

the law enforcement interaction with an individual with a disability – including the initial

encounter with the individual, as well as the decision how to implement a seizure when

otherwise permitted. *See* DOJ Law Enforcement Guidance § I. 2. Some examples of

reasonable modifications that might be necessary for law enforcement officers when

interacting with individuals with disabilities include:

    1.    Being aware that the officer's uniform, gun, or handcuffs may frighten an individual with mental illness, and instead adopting a nonconfrontational stance by removing the officer's hat, sitting down, and assuring the individual that he or she is heard.[51]

    2.    Asking an individual with mental illness questions regarding his basic needs such as "What would make you feel safer/calmer, etc.?"[52]

---

[51]    Police Executive Research Forum, *The Police Response to People with Mental Illnesses: Including Information on the Americans with Disabilities Act Requirements and Community Policing Approaches* 29, 34 (1997) *available at* www.ptb.state.il.us/resources/mentalillness/mpoliceresponse.pdf  (The Police Executive Research Forum (PERF) is a national membership organization composed of chief executives from municipal, county, and state law enforcement agencies).

[52]    *Id.* at 36.

Likewise, where the individuals with disabilities are of a young age, additional modifications may be necessary.

As the examples above demonstrate, modifying police procedures to accommodate individuals with disabilities does more than just assist the person with a disability.  Providing such modifications assists law enforcement officers in doing their jobs effectively.  Plaintiffs have identified available modifications, such as these, that would be reasonable in the run of cases.  *See* Compl ¶ 76.  Defendants may decline to implement such modifications only if they can demonstrate that doing so would create a fundamental alteration.  28 C.F.R. § 35.130(b)(7).

In determining whether a law enforcement entity has met its burden to show that modifying its policies or practices would result in a fundamental alteration, the Court must consider the level of the threat posed by the individual with a disability and the time pressure that the officer is under to respond.  As Sixth Circuit case law indicates, a reasonable modification may not be required in situations where a serious threat of injury and other extreme behavior is involved.  In *Tucker,* for instance, the Court ruled that it would be unreasonable to require a sign language interpreter and other accommodations where several individuals involved in a domestic dispute were arrested under "exigent or unexpected circumstances," including the presence of a large number of individuals, one of whom attempted to assault the officer.  539 F. 3d at 536.  Similarly, in *Thompson*, when a 40-year-old man with mental illness attempted to throw a machete at a police officer, the Court held that the need to disarm the man was the officer's first concern before he could consider the family's request to take the man to receive emergency medical care.  219 F. 3d at 558.

In both *Thompson* and *Tucker*, the individuals were described as violent — one had a dangerous weapon — and therefore the officer had to act swiftly to prevent injury to himself or to others. *See* DOJ Law Enforcement Guidance § III.12 (When a "violent crime [is] in progress" an "officer's immediate priority is to stabilize the situation").

In contrast to the facts in *Thompson* and *Tucker*, as alleged in the Complaint, the children did not present a significant threat to Officer Sumner or anyone else. S.R. is three and a half feet tall, eight years old, and 52 pounds. Compl ¶¶ 21. When he allegedly swung his arm at Defendant Sumner, no one else was in harm's way. Compl. ¶ 30. Because of that action, Defendant Sumner handcuffed S.R. for 15 minutes. Compl. ¶ 31. Defendant Sumner first handcuffed L.G., a nine-year-old, 56-pound girl, for 20 minutes when she tried to leave the school isolation room. Compl. ¶¶ 39, 43. Then Defendant Sumner handcuffed L.G. for a second time a few weeks later for running away, and resisting and struggling with Defendant Sumner and the Principal, both of whom are adults. Compl. ¶¶ 49-50. In each of these incidents, the children were unarmed.

### C. The ADA Prohibits Policies and Practices that Have a Discriminatory Effect on Children with Disabilities

In addition to the requirement to reasonably modify policies and practices when necessary to avoid discrimination on the basis of disability, the ADA regulation "prohibits both blatantly exclusionary policies or practices and nonessential policies and practices that are neutral on their face, but deny individuals with disabilities an effective opportunity to participate." U.S. Dep't of Justice, 28 C.F.R. Pt. 35, App. B at 688 (2015)*; cf. Crowder v. Kitagawa*, 81 F. 3d 1480, 1483-84 (9th Cir. 1996) (The ADA attempts to eliminate both deliberate discrimination and discrimination resulting from facially neutral laws and policies). Thus, the law prohibits public entities such as the Sheriff's Office from applying

nonessential policies and practices that are neutral on their face, but deny individuals with disabilities an effective opportunity to participate in a public entity's program.[53]

Plaintiffs allege the Kenton County Sheriff's handcuffing policy has just such a disproportionate effect on children with disabilities that affect their behavior.  The children allege that the effects of this policy and practice of handcuffing include substantial and disproportionate physical and emotional injuries and disruptive exclusions from school. Compl. ¶ 67.  The children claim that less harmful methods of intervention could be applied, such as crisis intervention, de-escalation, patience, and waiting.  Compl. ¶ 68.

The ADA prohibits the Sheriff's Office from utilizing criteria or methods of administration that have the effect of subjecting individuals with disabilities to discrimination on the basis of disability or that have the effect of defeating or substantially impairing accomplishment of the program with respect to disabilities.  28 C.F.R. § 35.130(b)(3)(i).  This prohibits public entities such as the Sheriff's Office from applying nonessential policies and practices that are neutral on their face but have the effect of discriminating based on disability. *See id.*; *see also* 28 C.F.R. pt 35 app. B, at 688 (2015) (discussing § 35.130(b)(3)).

Contrary to Defendants' assertion, Defs.' Mot. at 23, the children do not claim that they were subject to per se discrimination solely because the individuals arrested have disabilities. They instead allege that the Sheriff's Office uses an unnecessary policy and practice that has the effect of discriminating against children with disabilities that affect behavior.  In enacting the ADA, Congress intended not only to prohibit "outright discrimination" against individuals with disabilities, but also to combat "[other] forms of discrimination which deny disabled persons public services disproportionately."  *Crowder*, 81 F. 3d at 1483 (holding Hawaii's

---

[53]     The question of whether the policy or practice at issue here is nonessential is a question of fact that need not be addressed at the motion to dismiss stage.

policy of quarantining dogs entering the state violated the rights of visually impaired persons traveling with guide dogs).

## CONCLUSION

SROs, like all police officers, must respect the constitutional and statutory rights of the citizens they serve.  This is particularly critical in the school context, where the impact of a police interaction on a child can last a lifetime.  In considering the Plaintiffs' Fourth Amendment claims, the Court must consider whether an objectively reasonable SRO would have handcuffed elementary school students in school under the circumstances presented here, after the children exhibited misbehavior arising out of their disabilities.  Further, the Court must apply the ADA and evaluate whether Defendant Sumner should have reasonably modified his policing procedure instead of handcuffing the children, and whether the Sheriff's Office's handcuffing policies and methods of administration discriminate against children with disabilities, like S.R. and L.G.


Respectfully submitted,

FOR THE UNITED STATES:

ROBERT MOOSSY
Deputy Assistant Attorney General

EVE L. HILL
Deputy Assistant Attorney General

JUDY C. PRESTON
October 2, 2015                             Acting Chief
SHELLEY R. JACKSON
Deputy Chief
Special Litigation Section
Civil Rights Division

REBECCA B. BOND
Chief
KATHLEEN P. WOLFE
Special Litigation Counsel
Disability Rights Section


*/s/ Ryan C.Wilson*
MARINA MAZOR
RYAN C. WILSON
Trial Attorneys
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC  20530
(202) 514-6255 (telephone)
(202) 514-0212 (facsimile)
marina.mazor@usdoj.gov
ryan.wilson@usdoj.gov

## <u>CERTIFICATION</u>

I hereby certify that a true and exact copy of the foregoing Memorandum has been served electronically upon counsel of record using ECF.

**UNITED STATES DEPARTMENT OF JUSTICE**

<u>/s/ *Ryan C. Wilson*</u>
Ryan C. Wilson (DC bar number 1013907)


I further certify that a true and exact copy of the foregoing Memorandum has been served *via* First Class USPS mail service this 2nd day of October 2015 upon the following individuals who have not yet entered their appearance using ECF at the time of this filing.

N/A

**UNITED STATES DEPARTMENT OF JUSTICE**

<u>/s/ *Ryan C. Wilson*</u>
Ryan C. Wilson (DC bar number 1013907)