IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO. 2:15-cv-143 (WOB-JGW)

S.R., ET AL.                                    PLAINTIFFS

VS.                        <u>OPINION AND ORDER</u>

KENTON COUNTY SHERIFF'S
OFFICE, ET AL.                                  DEFENDANTS

## *Introduction*

This is an action brought pursuant to 42 U.S.C. § 1983 for unreasonable seizure and excessive force and for violation of the Americans with Disabilities Act, 42 U.S. § 12132. Plaintiffs, suing through their mothers, are two elementary school children who were handcuffed by a School Resource Officer ("SRO") while attending schools within the Covington Independent Public School District ("CIPS") in Covington, Kentucky.

Defendants are Charles Korzenborn, the Sheriff for Kenton County, Kentucky, in his official capacity only,[1] and Kevin Sumner, the SRO who handcuffed plaintiffs, in both his official and individual capacities. As discussed below, Sumner was assigned to

---

[1] The Complaint also named Kenton County Sheriff's Office as a defendant. Plaintiffs acknowledged during a preliminary pretrial conference on August 18, 2015, that the Sheriff's office is not a legal entity capable of being sued under 42 U.S.C § 1983. However, the Court has ruled that the Sheriff's Office is a "public entity" and thus a proper defendant under Title II of the ADA. (Doc. 59).

CIPS schools pursuant to a contract between the Kenton County Sheriff's Office and the Covington Board of Education. However, neither the Board of Education nor the school district is a party herein.

Jurisdiction is based on this Court's federal question jurisdiction. See 28 U.S.C. § 1331.

This matter is currently before the Court on defendants' motions for summary judgment regarding plaintiff S.R. (Doc. 151) and plaintiff L.G. (Doc. 152) and plaintiffs' motion for partial summary judgment (Doc. 153).

The Court heard oral argument on these motions on August 22, 2017, after which it took these motions under submission pending the parties' efforts to resolve this case. (Doc. 182).

The Court has now been notified that those efforts were unsuccessful and that the parties jointly request a written ruling on the above motions. (Doc. 186).

Therefore, having heard from the parties, and having carefully studied this matter, the Court issues the following Opinion and Order.

### *Factual and Procedural Background*

**A. The SRO Program**

In 2014, Kenton County Sheriff Department SROs served in the CIPS pursuant to a written agreement between the Sheriff and the CIPS board. (Doc. 151-4). That agreement provided that the

Sheriff would provide four SROs and one SRO Coordinator to serve as a liaison between the Sheriff's Office and the school board. Defendant Sumner was one of the four SROs provided to CIPS schools, and Ken Kippenbrock ("Kippenbrock") was the SRO Coordinator.

The SRO agreement also provided that SROs would be trained to work with youth in schools[2]; would assist school personnel with maintaining order in the schools; and would interact in a positive manner with all students. *Id.* at 3. This agreement also provided that the "SRO shall not act as a school disciplinarian, as disciplining students is a school responsibility." *Id.* at 4.

B. **Applicable Kentucky "Physical Restraint" Regulations**

Before discussing the handcuffing incidents at issue herein, the Court will review the Kentucky regulations applicable to such matters.

In 2013, the Kentucky Board of Education adopted a regulation titled "Use of physical restraint and seclusion in public schools." 704 KAR 7:160. The regulation defines "school personnel" to include "school resource officers." 704 KAR 7:160 § 1(13). It further provides that school personnel may use a "physical

---

[2] This is consistent with the Kentucky statute that defines a "School resource officer" as "a sworn law enforcement officer who has specialized training to work with youth at a school site." KRS 158.441.

restraint"[3] on a student only if the "student's behavior poses an imminent risk of physical harm to self or others." 704 KAR 7:160 § 3(a).

The regulation also provides that school personnel may not use physical restraints as "punishment or discipline," to "force compliance or to retaliate," as "a routine school safety measure," or as "convenience for staff." 704 KAR 7:160 § 3(1).

This regulation further prohibits school personnel from imposing "mechanical restraints" on students *at any time*. 704 KAR 7:160 § 3(2).[4] In addition, the regulation requires that all school personnel be trained annually in "state administrative regulations and school district policies and procedures regarding physical restraints and seclusion." 704 KAR 7:160 § 6(1)(a).

Finally, the preamble to this regulation states that it "does not prohibit the lawful exercise of law enforcement duties by sworn law enforcement officers." Kippenbrock, the SRO Supervisor, testified that he provided a copy of this regulation to the SROs when it was published in 2013. (Kippenbrock Depo. 120). He

---

[3] "Physical Restraint" is defined as "a personal restriction that immobilizes or reduces the ability of a student to move the student's torso, arms, legs, or head freely," with certain exceptions not relevant here. 704 KAR 7:160 § 1(10).

[4] "Mechanical restraint" is defined as "the use of any device or equipment to restrict a student's freedom of movement." Defendants do not contest that this includes handcuffs. 704 KAR 7:160, § 1(8).

pointed out the preamble, but he did not tell them that the regulation did not apply to them. (Kippenbrock Depo. 122).

**B.**     **The Handcuffing of S.R.**

In the fall of 2014, S.R. was an eight-year old boy enrolled in the third grade at Latonia Elementary School. He was approximately 4 feet tall, and he weighed 54 pounds. (Doc. 154-20). S.R. had been diagnosed with attention deficit hyperactivity disorder (ADHD) and post-traumatic stress disorder (PTSD). (Doc. 151-25). However, S.R. attended regular classes and, at the time of the incidents in question, had not been identified to school administrators as having any disability. He did not have an "Individual Education Plan" ("IEP"). (Meyer Aff. Doc. 151-24; Ramirez Depo. 130-31).

On November 11, 2014, S.R. was combative and violent toward school staff. Assistant Principal Maranda Meyer ("Meyer") and special education teacher Nicholas Staples ("Staples") used a kneeling "cradle restraint" to stop him from kicking and hitting. (Meyer Depo. 107-12). Meyer video recorded the incident so that she could show S.R.'s mother how he was behaving. (Meyer Depo. 81-82, 97). S.R. was given a one-day suspension. (Meyer Depo. 105-06).

S.R. returned to school on November 13, 2014. He again became disruptive in class, so Meyer was asked to intervene. She reported to the classroom and stayed for about twenty minutes, observing

S.R. and giving him instructions. (Meyer Depo. 117). She then left but soon another student came to get her because S.R. was again causing problems. Meyer went to get S.R. from the classroom to bring him to her office, but he ran away from her and tried to hit Staples. (Staples Depo. 39-40). Meyers and Staples then carried S.R. to Meyer's office using a cradle transport. (Meyer Depo. 118; Staples Depo. 42, 44).

While in the office, Meyers and Staples twice tried to deescalate S.R.'s behavior by using kneeling cradle restraints for approximately five minutes. Principal Ann James ("James") then came into the room, and James told Meyer to begin filming because James' IPad was not charged. (Meyer Depo. 120; James Depo. 72).

Staples held the door closed while S.R. tried to open it, swatting at Staples and trying to kick him in the leg. Staples testified that he had a bad injury on his leg and that S.R. knew about it and was intentionally trying to kick it. (Staples Depo. 27).

After several minutes, school counselor Michael Shipley ("Shipley") was asked to hold the door closed from outside so that Staples could move away from the door to avoid S.R.'s kicks. (Shipley Depo. 49). S.R. continued kicking the door and trying to push it open. (Shipley Depo. 66).

After determining that their de-escalation efforts were unsuccessful, school personnel made the decision to call defendant

Kevin Sumner ("Sumner"), an employee of the Kenton County Sheriff's Office, who was a SRO in Northern Kentucky. At that time, Sumner was at another school. (Sumner Depo. 142). Meyer told Sumner that they had a student who was out of control who was "physically assaulting" their staff, and that the parent was unavailable. (Sumner Depo. 144). Sumner drove to Latonia Elementary in his cruiser. (Sumner Depo. 143).

In the meantime, James' efforts to reach S.R.'s mother were successful, and S.R. began speaking to her on the phone. (Meyer Depo. 121; James Depo. 79). S.R. stated that he needed to use the restroom, and his mother requested that he be allowed to go to the bathroom and that she would come to pick him up. Thereafter, Meyer stopped filming because she thought S.R. was calming down.

When Sumner arrived at the school, he saw Shipley holding the door to Meyer's office closed. (Sumner Depo. 143). Sumner entered the office, and he saw S.R. standing at Meyers' desk talking on the phone with his mother. (*Id.* at 170). Sumner did not know S.R. before this time. (Sumner Depo. 139). James asked Sumner to escort S.R. to the bathroom, and he did so. When Sumner and S.R. returned to Meyer's office, S.R. did not follow Sumner's instruction to sit down. Sumner leaned over to speak to S.R., telling him that his mother was on the way. (Sumner Depo. 163). S.R. then swung his elbow towards Sumner's face, and Sumner leaned

to the left and put out his hand, which was struck by S.R.'s elbow. (Sumner Depo. 162-62; Meyer Depo. 123-24; Staples Depo. 53).

Meyer then resumed filming, and Sumner said "you're not allowed to swing at me like that." Sumner handcuffed S.R. behind his back, placing the cuffs on S.R.'s biceps above the elbows. The video shows that S.R.'s arms are pulled tightly behind his back with what appears to be only approximately three or four inches between his elbows. Sumner testified that he checked the handcuffs for tightness and that, since the chain connecting the handcuffs was nearly as long as the width of S.R.'s body, he had no reason to believe it would cause him pain. The video clearly demonstrates, however, that the chain is not nearly as wide as S.R.'s body, and that his arms are extremely taut.

Sumner can be heard stating, "You can do what we've asked you to or you can suffer the consequences." (Doc. 156 – video). S.R. can be heard saying, "Oh, God. Ow, that hurts." (Meyer Depo. 136-37). Sumner tells S.R. that: if he wants the handcuffs off, he has to behave and "ask nicely"; "if you want them off, all you have to do is stop kicking"; and "it's up to you if you want them off or not."

S.R. remained handcuffed for approximately fifteen minutes, crying and squirming, after which Sumner removed the cuffs. (Meyer Depo. 128). Thereafter, S.R.'s mother arrived at the school to take him home and learned he had been handcuffed. She told Meyer

that S.R. had PTSD and so she was concerned about his being handcuffed. (Meyer Depo. 142).

When S.R. and his mother left, the school staff asked Sumner to write an offense report to document that they had been victims of a crime. (Sumner Depo. 172). (Doc. 154-22).

A month after the handcuffing incident, S.R.'s mother requested, for the first time, an educational accommodation for S.R.

In January 2015, the Kenton County Sheriff was contacted by the Children's Law Center regarding the handcuffing incident. Sheriff Korzenborn and Kippenbrock directed Sumner to prepare an investigative narrative regarding the handcuffing of S.R. (Sumner Depo. 174-5; Kippenbrock Depo. 91; Korzenborn Depo. 71).

In April 2015, school administrators determined that S.R. needed a formal behavior intervention and crisis plan, but they found insufficient evidence of a disability. S.R.'s mother challenged that determination, and eventually the parties settled and agreed to a 504 Plan effective August 18, 2015. (Meyer Depo. 143; Ramirez Depo. 31-33).

Finally, while S.R. had been treated in 2012 for ADHD symptoms, school administrators received no documentation of such diagnosis until 2015.

## C.  The Handcuffing of L.G.

In the fall of 2014, L.G was a nine-year old girl enrolled in the fourth grade at John G. Carlisle Elementary School in Covington.  She weighed about 56 pounds.  L.G. had been diagnosed with ADHD and she had a 504 plan, but she attended regular classes. (Collins Depo. 175; Craig Depo. 37-38).  The plan did not address any behavioral issues or problems.

On August 21, 2104, L.G. was being disruptive in her classroom, banging on the table and making loud noises.  (Collins Depo. 129).  Principal Joy Collins ("Collins") went to the classroom and, with the assistance of another teacher, escorted L.G. out of the classroom to the calm room.  (Collins Depo. 131). Collins called for Sumner and asked him to talk to L.G. about the seriousness of such behavior, and he did.  (Collins Depo. 182; Sumner Depo. 195).  L.G. then appeared to have calmed down, and Sumner left the campus.  (Sumner Depo. 198).

However, L.G.'s behavior again escalated.  (Collins Depo. 134-35).  When L.G. began hitting and kicking again, Sumner was called to help take her home because efforts to reach her mother were unsuccessful.  (Collins Depo. 138; Craig Depo. 45-49).  When Sumner arrived, L.G was screaming and refusing to sit down. (Sumner Depo. 199).  Sharon Craig ("Craig"), the Assistant Principal, determined that they could not safely put L.G. on the school bus, so she asked Sumner to drive her and L.G. to L.G.'s

home to wait for her mother. (Sumner Depo. 199-201; Craig Depo. 50) They left the school around 2:00 p.m., and L.G.'s mother arrived home around 3:30 p.m. (Craig Depo. 53).

This incident was Sumner's first encounter with L.G., and he knew nothing of her record from prior school years. (Sumner Depo. 186, 193).

In September 2014, Sumner became aware of issues with L.G.s mother's not ensuring that L.G. took medicines she was prescribed. (Sumner Depo. 209; Craig Depo. 60-64). He had been informed by school personnel that L.G.'s behavioral issues were related to the failure to take her medication, and that they had truancy concerns due to her multiple absences. (Sumner Depo. 212-215).[5]

### 1. October 3, 2014 Handcuffing

On October 3, 2014, L.G. brought toys to school that were not permitted and refused to put them away or follow the instructions of her teacher, Ashley Miller ("Miller"). (Collins Depo. 108). Miller contacted Collins and Craig. (Collins Depo. 109) L.G. was wandering around the room, opening and shutting other people's lockers, and being disruptive. (Collins Depo. 100, 176). Collins and Craig escorted L.G. out of the classroom, but as they walked down the hallway, L.G. dropped to the floor and wrapped herself

---

[5] Sumner ultimately filed a JC-3 Report with the Kentucky Cabinet for Health and Family Services after the October 3, 2014 incident. The Kenton County Family Court entered a finding of neglect against L.G.'s mother on February 17, 2015.

around Collins' legs.  (Collins Depo. 110, 177; Craig Depo. 71).

Collins and Craig were able to carry L.G. to the calm room, as she continued to hit and kick.  (Collins Depo. 111).

In the calm room, L.G was scratching, kicking, hitting, blowing snot, and trying to bite Collins and Craig.  (Collins Depo. 114, 118, 178; Craig Depo. 73-75).  This went on for approximately an hour.  The school nurse brought a spit guard for L.G. but it was not effective.  (Collins Depo. 231).

Meanwhile, school staff were attempting to contact L.G.'s mother.  (Collins Depo. 114).  Unable to do so, Craig and Collins asked an assistant to call for Sumner, who was at another school. (Collins Depo. 116; Craig Depo. 75).  They informed him that they had a student who was "out of control" and the mother was not available.  (Sumner Depo. 225).

When Sumner arrived, he heard L.G. screaming from the calm room.  (Sumner Depo. 226).  He observed that Craig and Collins were trying to keep L.G. from hitting them.  (Sumner Depo. 226-27).  Sumner tried to use de-escalation techniques to calm L.G., but she tried to assault him and was spitting and blowing snot on him.  (Sumner Depo. 233-34; Collins Depo. 122).  Sumner then decided to place her in handcuffs.  (Sumner Depo. 234, 236). Despite the handcuffs, L.G. did not calm down and Sumner called for an ambulance because he was concerned for her medical condition.  (Sumner Depo. 237-241).

Paramedic Jerry Mills arrived at the school and went to the calm room. Mills began talking to L.G., and he told Sumner to remove the handcuffs. (Mills Depo. 10; Collins Depo. 125). Mills put his arm around L.G.'s shoulders to comfort her while Sumner removed the handcuffs. (Mills Depo. 10-11; Sumner Depo. 257). Mills hugged L.G. and she hugged him back. (Collins Depo. 125). Mills sat and talked with L.G. in the ambulance on the way to Children's Hospital. (Mills Depo. 11). Collins and Sumner followed the ambulance since no parent was available, and Collins waited for about an hour until L.G.'s mother arrived. (Collins Depo. 126). L.G. was discharged later that morning without any physical injury.

### 2. October 23, 2014 Handcuffing

On October 23, 2014, L.G. arrived at school at 7:25 and began wandering into unsupervised areas, instead of going to the cafeteria where the children wait until 7:30 when they go to their homerooms. (Collins Depo. 90). L.G. refused Collins' instructions to go to the cafeteria and continued walking towards a stairway that led upstairs to classrooms, which at that time were unsupervised. (Collins Depo. 90). Whenever Collins approached L.G., L.G. would run in the opposite direction. (Collins Depo. 92, 94).

Sumner, who was assigned to the school that day, saw Collins trying to catch up to L.G. in the hallway. (Sumner Depo. 260).

Sumner saw L.G. coming towards him as he stood with his back to the stairway leading to the second floor, and Collins and Craig were telling L.G. to go to the cafeteria.  (Sumner Depo. 262).

When L.G. reached Sumner, he told her to go to the cafeteria where she was supposed to be.  (Sumner Depo. 265, 273).   L.G. tried to push past him, and she dropped to her hands and knees and tried to crawl through his knees.  (Sumner Depo. 262; Collins Depo. 94).  She then pulled up his pants leg and tried to scratch him. (Sumner Depo. 262).  L.G began screaming, and Craig was able to move her into the "cub store," a room where school supplies are sold.  (Sumner Depo. 262; Collins Depo. 95-96; Craig Depo. 89-91, 94).

Once inside the cub store, L.G. became physically aggressive, hitting, kicking, and scratching Craig.  (Craig Depo. 91, 98; Sumner Depo. 263).   Sumner pulled L.G. off of Craig and tried to hold her physically for a few minutes, but she continued the same behavior.  (Sumner Depo. 263, 280, 286; Craig Depo. 98-100). Sumner told L.G. that if she did not stop, he would handcuff her. (Craig Depo. 100).  L.G. continued to kick and hit, and Sumner placed her in handcuffs, above her elbows behind her back.  (Craig Depo. 100-01).

Assistant Superintendent Wilkerson contacted L.G.'s mother, who came to school to get her.  (Sumner Depo. 283, 288; Craig Depo. 101-03).  Her mother testified that when she arrived, L.G. was on

her knees and Sumner was holding her arms up behind her above her head. (Jackson Depo. 165-68). Sumner then removed the handcuffs.

At that time, Collins initiated an Admissions and Release Committee ("ARC") meeting to obtain consent from L.G.'s mother for L.G. to undergo a special education evaluation. (Collins Depo. 173-74; Jackson Depo. 37-38). It was ultimately determined that L.G. qualified as a child with a disability due to her ADHD, and an IEP was developed. (Collins Depo. 199; Craig Depo. 39-40).

Sumner never initiated any criminal charges against S.R. or L.G. (Sumner Depo. 162, 288). He testified that "none of what they did was worthy of trying to file a criminal charge." (Sumner Depo. 288).

D. **This Lawsuit**

Plaintiffs filed this lawsuit on August 3, 2015, against Sumner, in both his official and individual capacities, and Korzenborn, in his official capacity only.[6] (Doc. 1). The Complaint alleges the following causes of action: (1) Unreasonable Seizure and Excessive Force in violation of the Fourth and Fourteenth Amendments (against all defendants), pursuant to 42 U.S.C. § 1983; (2) Disability Discrimination under the Americans

---

[6] The Complaint also named Kenton County Sheriff's Office as a defendant. Plaintiffs acknowledged during a preliminary pretrial conference on August 18, 2015, that the Sheriff's office is not a legal entity capable of being sued under § 1983. However, the Court has ruled that the Sheriff's Office is a "public entity" and thus a proper defendant under Title II of the ADA. (Doc. 59).

with Disabilities Act (ADA), 42 U.S.C. § 12132 (against Kenton County Sheriff's Office only); and (3) Failure to Accommodate under the ADA (against Kenton County Sheriff's Office only). Plaintiffs seek damages and declaratory and injunctive relief.

After the video of S.R.'s handcuffing was released to the media, on August 4, 2015, Kenton County Sheriff Chuck Korzenborn issued a Press Release, which stated:

> School superintendents and administrators want, and need, to provide a safe environment for students and teachers. School personnel are permitted, like any other citizen, to request the assistance of a law enforcement Deputy. **Covington School's personnel requested assistance from the police during school hours after school administrators' efforts to deescalate and defuse a threat to others had proven unsuccessful. Deputy Sumner responded to the call and did what he is sworn to do and in conformity with all constitutional and law enforcement standards. . . . I steadfastly stand behind Deputy Sumner who responded to the school's request for help.** Deputy Sumner is a highly respected and skilled law enforcement Deputy, and is an asset to the community and those he serves.

(Doc. 153-35) (emphasis added). Korzenborn had reviewed the video of S.R.'s handcuffing prior to issuing this statement. (Korzenborn Depo. 59).

*Analysis*[7]

## A. <u>Severance</u>

Although the Court previously denied defendants' motion to sever the claims of S.R. and L.G. (Doc. 183), it will set forth its reasoning here so that the record is complete.

Rule 20 of the Federal Rules of Civil Procedure states that persons may join as plaintiffs in one action if: (1) "they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions"; and (2) "any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a).

"The purpose of Rule 20(a) is to promote judicial economy and trial convenience." *Dejesus v. Humana Ins. Co.*, Civil Action No. 3:15-CV-862-GNS, 2016 WL 3630258, at *2 (W.D. Ky. June 29, 2016) (citation omitted). This rule "is governed by the principle to allow the broadest possible scope of action consistent with fairness to the parties." *Id.* (internal quotations and citations omitted).

Defendants' argument that S.R. and L.G.'s claims should be severed is not well taken. Their claims both allege a practice of

---

[7] Also before the Court is plaintiffs' appeal from a ruling by the United States Magistrate Judge on a discovery matter. (Doc. 142). The Court does not find the appeal well taken, but given the rulings herein, it considers that appeal to be moot.

unconstitutionally handcuffing young school children in the same school district by the same SRO. The record is replete with similarities in these children's situations: they are both young, of small stature, suffer from emotional disturbances that allegedly affect their behavior, and they have been elbow-cuffed by defendant Sumner in response to such behavior at school.

Further, it is clear that a common question of law is present: whether the elbow-cuffing of these children was unconstitutional. Indeed, the commonality of plaintiffs' claims is evidenced by the fact that defendants' motions for summary judgment are, with respect to their legal arguments, identical.

Defendants argue that any jury will be confused and prejudiced by hearing plaintiffs' claims together, particularly due to the video of S.R.'s handcuffing. The Court rejects this argument.

First, juries are routinely tasked with grasping much more complicated fact patterns than the ones here, even where there is only a single plaintiff.

Second, any alleged prejudice by the admission of evidence as to one plaintiff could be cured by a limiting instruction.

Finally, the fact that S.R.'s handcuffing was captured on camera and L.G.'s was not is irrelevant, as it is undisputed that they were subjected to the same cuffing technique.

Therefore, the Court holds that "the interests of judicial economy, convenience for the parties, and expediency all weigh in

favor of permitting Plaintiffs' claims to proceed in one action."
*Id.* at *7.

## B. Section 1983 Claims

"To state a claim under § 1983, a plaintiff must set forth
facts that, when favorably construed, establish: (1) the
deprivation of a right secured by the Constitution or laws of the
United States; (2) caused by a person acting under the color of
state law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015)
(citing *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th
Cir. 2006)). There is no dispute that defendant Sumner was acting
under color of state law. The question is whether he deprived
L.G. and S.R. of their Fourth Amendment rights.

### 1. Violation of Constitutional Right

Plaintiffs allege that Sumner's handcuffing of L.G. and S.R.
constituted an unlawful seizure under the Fourth Amendment. They
also argue, however, that even if the seizures were lawful, Sumner
still employed unlawful excessive force.

Unlawful seizure and excessive force are distinct claims.
*See Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007). However,
when the seizure itself is unlawful, a claim that the force used
was excessive is subsumed in the seizure analysis because *any*
amount of force is excessive. *M.D. v. Smith*, 504 F. Supp.2d 1238,
1248 (M.D. Ala. 2007) (citation omitted).

Determining whether a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interests at stake. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

Because the test of reasonableness under the Fourth Amendment is not capable of precise definition, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Ultimately, the court must determine whether the totality of the circumstances justify the challenged use of force. *Id.* at 396.

Finally, the reasonableness of defendants' actions is a pure question law for the court. *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) (citation omitted).

There is no dispute here that both S.R. and L.J. were "seized" so as to trigger the protections of the Fourth Amendment. The question, then, is whether their seizures were objectively reasonable considering all the circumstances.[8]

---

[8] The Court notes that plaintiff's unlawful seizure claim is limited to the handcuffing; plaintiffs do not challenge Sumner's

The Court first addresses the parties' dispute over whether 704 KAR 7:160 § 3(2)(a) — which specifically prohibits school personnel from employing mechanical restraints on school children — applies to Sumner. Plaintiffs argue that "school personnel" is defined to include SROs, and that Sumner was acting in that capacity when he handcuffed S.R. and L.G. Defendants, in turn, rely on the preamble to this regulation, which states that it "does not prohibit the lawful exercise of law enforcement duties by sworn law enforcement officers," arguing that Sumner was acting as a deputy sheriff at the time of these incidents.

Because SROs wear two hats while serving in Kentucky schools, it can be difficult to discern when their actions constitute those of school personnel or those of law enforcement. Moreover, the existence of a regulation prohibiting allegedly unconstitutional conduct is but one factor in the *Graham* analysis. *See Hope v. Pelzer*, 536 U.S. 730, 742 (2002).

Given the above, the Court need not determine the applicability of 704 KAR 7:160 § 3(2)(a) because Sumner's seizure and use of force, under the facts of this case, were unreasonable, even in the absence of the above regulation.

Applying the Graham factors, the severity of the "crime" committed by S.R. and L.G. — assault — weighs in their favor.

---

use of a brief physical hold on L.G. during the October 23, 2014, incident.

While S.R. kicked a teacher and L.G. tried to and/or did hit a teacher, these are very young children, and their conduct does not call to mind the type of "assault" which would warrant criminal prosecution. Indeed, Sumner testified that "none of what they did was worthy of trying to file a criminal charge." (Sumner Depo. 288).

The second factor, whether the children posed an immediate threat to themselves or others, weighs in S.R.'s favor. At the time he was handcuffed, S.R. had largely calmed down, Sumner had escorted him to the restroom without incident, and they had returned to the office. While Sumner testified that S.R. swung his elbow towards Sumner, such can hardly be considered a serious physical threat from an unarmed, 54-pound eight-year-old child.

This factor weighs less in favor of L.G., who was engaging in more physical abuse towards her teachers and Sumner.

Nonetheless, the age and stature of these children is highly relevant to this analysis. *See Hoskins v. Cumberland Cnty. Bd. of Educ.*, No. 2:13-cv-15, 2014 WL 7238621, at *8 (M.D. Tenn. Dec. 17, 2014); *Williams v. Nice*, 58 F. Supp.3d 833, 838 (N.D. Ohio 2014) (in analyzing reasonableness of officer's actions in seizing student, the Court must consider the size and stature of the parties involved).

Finally, the method of handcuffing that Sumner employed leads this Court to conclude that his actions were unreasonable and

constituted excessive force as a matter of law.  The video of S.R. shows that his arms were pulled tightly behind him, with only inches between his elbows.  While Sumner testified that the chain between the cuffs was as wide as S.R.'s torso, the video belies that assertion.  Where a witness's version of the facts "cannot be countenanced based upon what the video shows," the Court must adopt the video as fact.  *Marvin v. City of Taylor*, 509 F.3d 234, 239 (6th Cir. 2007).

Upon being cuffed in this manner, S.R. cried out, "Ow, that hurts."  It was thus immediately apparent that this method — which, it is undisputed, was the same method by which L.G. was cuffed — was causing pain.  S.R. was left in this position to cry and squirm for fifteen minutes.

Plaintiff's handcuffing expert, Robert Rail, testified that he does not know of any police instructor in the United States who would allow the elbow cuffing of children such as was used on S.R. and L.G., nor does he know of any program that teaches that method. (Rail Depo. 109-10).

Even defendants' handcuffing expert, William A. Payne — who has been conducting handcuffing training for law enforcement for over 20 years — testified that he has never trained law enforcement to use handcuffs above the elbow.  (Payne Depo. 37, 121).  He further testified that he was not aware of any law enforcement agency that trains their officers to use such a technique.  (*Id.*).

The Court notes that the question of whether "traditional" handcuffing of these children would have been unreasonable under these circumstances is not before the Court, and the Court expresses no opinion thereon. Instead, the Court's holding is limited to the specific facts and circumstances of this case.

Therefore, under the totality of the circumstances, the Court concludes as a matter of law that Sumner's manner of handcuffing S.R. and L.G. was an unconstitutional seizure and excessive force.

## 2. Qualified Immunity

Having found a constitutional violation, the Court must consider whether Sumner is entitled to qualified immunity.

"Government officials are entitled to qualified immunity for their actions unless (1) the plaintiff has established a violation of a constitutional right, and (2) the right at issue was clearly established at the time of the incident." *Miller v. Maddox*, 866 F.3d 386, 395 (6th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The key inquiry is whether the defendant had "fair warning" of the unconstitutionality of his actions. *Id.* (citation omitted).

"The right also must be clearly established in a particularized sense, so that the contours of the right are clear enough for any reasonable official in the defendants' position to know what the official is doing violates that right." *Id.* (internal quotations and citation omitted).

The Supreme Court has recently emphasized that the question of whether a right is "clearly established" should not be defined at a "high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). While there does not need to be case law directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 551 (citation omitted).

Finally, the qualified immunity analysis "is an objective one; motive is irrelevant." *Champion v. Outlook Nashville*, 380 F.3d 893, 904 (6th Cir. 2004).

On the facts of this case, qualified immunity is a close call. Neither party points to a Supreme Court or Sixth Circuit decision directly on point that would have alerted a reasonable officer in 2014 to the unlawfulness of his actions under these circumstances.

In *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), which involved searches of children in a school setting, the Court recognized that public school students' rights under the Fourth Amendment are not as broad as those of the public and adopted a "reasonableness" test based on all the circumstances. *Id.* at 341-42. Courts have applied the "relaxed" *T.L.O.* standard to unlawful seizure claims in the school setting. *Hoskins v. Cumberland Cnty. Bd. of Educ.*, No. 2:13-cv-15, 2014 WL 7238621, at *9 (M.D. Tenn. Dec. 17, 2014) (listing cases). *See also S.E. v. Grant Cnty. Bd. of Educ.*, 544

F.3d 633, 640-41 (6th Cir. 2008) (applying *T.L.O.* line of authority to seizure of student by assistant principal).

At a general level, one might argue that *T.L.O.* put police officers on notice that they would be subject to a reasonableness standard in determining whether their search or seizure of a school child passes constitutional muster. However, the Sixth Circuit has rejected such an application of *T.L.O.* in the qualified immunity context, reasoning that *T.L.O.* merely established basic principles of law without guidance as to their application in specific situations. *Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 607 (6th Cir. 2005).

In *Beard*, high school students who were strip searched sued school officials and a police officer alleging Fourth Amendment violations. The Sixth Circuit held that the searches did violate the students' constitutional rights, but that the defendants were entitled to qualified immunity because, notwithstanding the general principles set forth in *T.L.O.*, the lack of factual context similar to the case before the Court meant that *T.L.O.* could not have "truly compelled" defendants to realize that they were acting illegally in conducting the strip searches. *Id.*

Similarly here, the broad principles set forth in *T.L.O.* would not have alerted Sumner to the unlawfulness of his actions under the specific facts of this case.

As *Beard* observed, without Supreme Court authority on point
at a sufficiently specific level, one must then look at in-Circuit
authority, and "finally to decisions of other circuits."  *Id.* at
606-07 (citation omitted).

The parties cite no Sixth Circuit authority that would have
alerted Sumner to the illegality of his actions.  However, at least
two other Circuits had denied qualified immunity to police officers
who handcuffed young school children.  *See C.B. v. City of Sonora*,
769 F.3d 1005, 1039-40 (9th Cir. 2014) (officer who handcuffed
calm, compliant but nonresponsive 11-year-old child not entitled
to qualified immunity); *Gray v. Bostic*, 458 F.3d 1295, 1306 (11th
Cir. 2006) (handcuffing of nine-year-old student who had
threatened to hit coach was unlawful seizure; incident was over,
student posed no threat, and handcuffing by sheriff's deputy was
attempt to punish student and change her behavior in the future).

Under the Sixth Circuit's teaching in *Beard*, however, these
out-of-circuit cases are insufficient to satisfy the "clearly
established" requirement:

> These cases were not sufficient to establish the unlawfulness
> of the defendants' actions in this case.  **In the "rare
> instance" where it is proper to seek guidance from outside
> this circuit, the law will only be clearly established where
> the cases from outside the circuit "both point unmistakably
> to the unconstitutionality of the conduct complained of and
> [are] so clearly foreshadowed by applicable direct authority
> as to leave no doubt in the mind of a reasonable officer that
> his conduct, if challenged on constitutional grounds, would
> be found wanting."** . . .  The cases dealing with school strip
> searches from courts in other circuits are not "clearly

27

foreshadowed by applicable direct authority," and therefore do not clearly establish that the searches in this case were unreasonable.

*Beard*, 402 F.3d at 608 (citation omitted) (emphasis added).

Here, the two out-of-circuit cases cited above both rely on *T.L.O.*, which *Beard* held is insufficiently generalized to constitute "applicable direct authority."

Therefore, plaintiffs have not shown that it was "clearly established" in 2014 that Sumner's handcuffing of S.R. and L.G. was unconstitutional, and Sumner is thus entitled to qualified immunity.

### D. Municipal (County) Liability

"To prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged [constitutional] violation occurred because of a municipal policy, practice, or custom." *Brown v. Chapman*, 814 F.3d 447, 462 (6th Cir. 2016) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)).

Municipal liability will also lie where an official with final decision making authority ratified illegal actions. *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (citation omitted).

The record here establishes municipal liability against Kenton County as a matter of law.

Kenneth Kippenbrock was the SRO Coordinator for the Kenton County Sheriff's Office at the time of these events. (Kippenbrock Depo. 31, 44-45). He testified that Sumner's handcuffing of S.R.

and L.G. was consistent with the policy of the sheriff's department. (Kippenbrock Depo. 76). He also testified that since the SRO program was initiated, more than ten children have been handcuffed by SROs in schools, and it is possible that the number is more than twenty-five. (Kippenbrock Depo. 153-54).

Kenton County Sheriff Korzenborn also testified that Sumner acted in accordance with all applicable Kenton County policies in handcuffing S.R. and L.G. He has never asked Sumner whether Sumner has ever handcuffed other elementary children in the district, and he is not interested in knowing how often his deputies handcuff school children. (Korzenborn Depo. 77-79, 89). Handcuffing children above their elbows behind their back is acceptable practice by his deputies. (Korzenborn Depo. 84).

Korzenborn also testified that the Kentucky Administrative Regulations do not apply to his deputies, and that his employees who are school resource officers perform their duties like any other law enforcement officers. (Korzenborn Depo. 35-36) ("A school resource officer is a law enforcement officer, period."). Korzenborn further testified that he was not familiar with the Kentucky Administrative Regulations regarding the use of mechanical restraints in schools. (Korzenborn Depo. 53).

Sumner testified that he was told by his supervisors at the Kenton County Sheriff's Office that they stood by him in the way he handcuffed S.R. and L.G. (Sumner Depo. 183-84).

Korzenborn has not implemented any changes in the training of his SROs since these incidents.  (Korzenborn Depo. 92).

Given this undisputed testimony, Kenton County is liable as a matter of law for Sumner's unlawful handcuffing of S.R. and L.J.

## C. **Disability Discrimination**

Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be exclude from participation in or denied the benefits of the services, programs, or activities of the public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

The ADA requires that the challenged discrimination to occur "because of" disability, "which is another way of saying that the plaintiff must establish a but-for relationship between the protested act and the individual's disability."  *Gohl v. Livonia Public Schs. Sch. Dist.*, 836 F.3d 672, 682 (6th Cir. 2016) (citation omitted).  The ADA "requires the plaintiff to present sufficiently 'significant' evidence of animus toward the disabled that is a but-for cause of the discriminatory behavior."  *Id.*

Plaintiffs allege that Kenton County violated the ADA through its practice of imposing unnecessary physical restraints on schoolchildren with disabilities and by failing to provide "reasonable modifications" to S.R. and L.G.  (Compl. ¶¶ 65-78).

The record does not contain evidence that raises any triable issue of fact on plaintiffs' ADA claims.

Principal Collins testified that the school does not give SROs such as Sumner information about students' mental or emotional problems or about their medications or diagnoses. (Collins Depo. 141-43). Although Sumner knew that L.G. took medication for mental health issues, (Collins Depo. 269-70), there is no evidence that Sumner believed her to have a "disability."

As to S.R., while he had been diagnosed with ADHD and PTSD, the record is undisputed that that information had not been communicated to the school or Sumner. Moreover, the day of the handcuffing was Sumner's first encounter with S.R.

S.R.'s mother testified that no one has ever told her that S.R.'s behavior on the day in question was due to a disability. (Ramirez Depo. 132).

Furthermore, there is no evidence that either S.R. or L.J.'s mother requested modifications as to any contact with Sumner or the Kenton County Sheriff.

Given this evidence, no reasonable jury could find that Sumner's handcuffing of S.R. and L.J. would not have occurred "but for" their alleged disabilities, as opposed to their behavior on the days in question. Kenton County is thus entitled to summary judgment on the ADA claims.

Therefore, having reviewed this matter, and the Court being sufficiently advised,

**IT IS ORDERED** that:

(1) Defendants' motions for summary judgment (Docs. 151, 152) be, and are hereby, **GRANTED IN PART AND DENIED IN PART.** Specifically, the motions are **GRANTED** as to Sumner's defense of qualified immunity and as to plaintiffs' ADA claims. The motions are **DENIED**, however, as to plaintiffs' claims of unlawful seizure and excessive force and municipal liability against Kenton County for those violations;

(2) Plaintiffs' motion for summary judgment (Doc. 153) be, and is hereby, **GRANTED IN PART AND DENIED IN PART**. Specifically, the motion is **GRANTED** as to plaintiffs' claims of unlawful seizure and excessive force and municipal liability against Kenton County for those violations. The motion is **DENIED** as to plaintiffs' ADA claims; and

(3) The parties shall confer and agree on three (3) dates between October 23 and November 17, 2017, when the Court can schedule a status conference to discuss setting this matter for a trial on damages. The parties shall file a status report **on or before October 20, 2017**, advising the Court of these dates.

This 11th day of October, 2017.



Signed By:

*William O. Bertelsman*

United States District Judge